## UTLEY v. DONALDSON.

1. The telegraphic correspondence in this case, in relation to the sale and purchase of certain bonds, considered, and held to constitute a complete contract of sale upon the condition, or with an implied warranty, that the bonds were genuine.

2. The contract was not so modified by subsequent correspondence as to amount to a waiver on the part of the purchaser of such condition or warranty.

ERROR to the Circuit Court of the United States for the Eastern District of Missouri.

This is an action to recover from Donaldson & Fraley the sum of $15,375, paid to them by the plaintiffs, for fifteen bonds, purporting to be first mortgage bonds of the Central Pacific Railroad Company, and which subsequently proved to be counterfeit.

The court below found the following facts : —

1. On the twenty-fourth day of May, 1871, Newman & Havens, bankers, of Leavenworth, Kansas, telegraphed to St. Louis from Leavenworth to W. Nichols, cashier of the Commercial Bank of St. Louis, as follows : —

" Get rate for $15,000, California Central Pacific R. R. bonds, delivered to-morrow."

This despatch was, on said day, shown by Nichols to defendants, and defendants made a bid for said bonds, i.e., (100½) one hundred and one-half. This offer was reported by telegraph to Newman & Havens by Nichols, and was by them accepted by telegraph.

2. On the following day, May 25, Nichols received from Newman & Havens a letter, as follows : —

" LEAVENWORTH, KANSAS, 24th May, 1871.
" W. NICHOLS, Esq., Cash., St. Louis, Mo. :
" DEAR SIR, — Your favor of the        inst., with inclosure as stated, is received. We, this A.M., telegraphed you as follows, viz. : ' Get rate for $15,000, California Central Pacific R. R. bonds, delivered to-morrow.' Same is hereby confirmed. We herewith hand you bonds. Please close the transaction and telegraph us immediately. The party selling these bonds is waiting here to get

the money for them. This same gentleman is an entire stranger to us, therefore, will you be kind enough to satisfy yourself that the bonds are all right. We desire them sold without any recourse on us. Your early attention will much oblige, respectfully, yours,

           " Newman & Havens."

This letter accompanied fifteen papers, purporting to be so many bonds in said letter described.

Nichols handed this letter to defendants May 25, with the bonds, and proposed that the defendants should take said bonds without recourse. Defendants refused to take the bonds without recourse, but said they would do this; viz., would give to the Commercial Bank their (defendants') check for the agreed amount, $15,075, with the understanding that this check was not to be charged up by the Commercial Bank, where defendants kept their accounts, until defendants had sent the bonds to New York and learned that the bonds were (" O. K.") correct. If the bonds were found to be correct, the check was to be charged up against defendants, and Newman & Havens to be advised; if not, the bonds were to be returned to the Commercial Bank, and the check returned to defendants.

3. On the 24th of May, defendants having received invitation to make a bid from Nichols, as requested by Newman & Havens in their despatch, telegraphed to plaintiffs by night despatch as follows : —

           " St. Louis, May 24, 1871.

" To Utley, Dougherty, & Scott :

   " Make best bid fifteen Central Pacifics, quick.

           " Donaldson & Fraley."

After sending this despatch, and before receiving reply thereto, to wit, on the morning of May 25, defendants were shown by Nichols the letter of May 24, from Newman & Havens above recited, and the bonds.

Plaintiffs received this despatch, and on the twenty-fifth day of May replied by despatch, as follows : —

           " New York, May 25, 1871.

" To Donaldson & Fraley :

   " We will buy Central Pacifics at a hundred and two and a half (102½).

           " Utley, Dougherty, & Scott."

Defendants received this despatch on the same day about ten A.M.; and on the same day replied by telegraphic despatch, as follows: —

"ST. LOUIS, May 25, 1871.
"To UTLEY, DOUGHERTY, & SCOTT, New York:

"We accept your offer, fifteen Centrals, one hundred two and a half.

"DONALDSON & FRALEY."

4. On the same day plaintiffs wrote and mailed a letter to defendants, as follows: —

"NEW YORK, May 25, 1871.

"DEAR SIRS, — Your telegram of to-day received. You have sold us fifteen thousand Central Pacific 6's at 102½ flat. . . . .

"Respectfully yours,
"UTLEY, DOUGHERTY, & SCOTT."

The fifteen bonds were delivered to defendants by Nichols, cashier of Commercial Bank, May 25, and were by defendants forwarded by express on the same day to the Bank of North America, New York, with a draft on plaintiffs for $15,375, the bonds to be delivered by the bank to plaintiffs on payment of the draft. By mail — mailed by defendants. On the morning of the 25th of May defendants sent to plaintiffs a letter, as follows: —

"ST. LOUIS, May 25, 1871.
"Messrs. UTLEY, DOUGHERTY, & SCOTT:

"GENTLEMEN, — In accordance with your offer for 15 Central Pac. 1st mort. bonds, 102½, we replied, We accept your offer, and have forwarded them by ex. to Bank North America, with draft attached for $15,375. We would further add, that we have purchased the bonds from a party strange to us; and, not having ever handled any of the Pacific Central, we would sell the bonds without recourse as to their being genuine; consequently, please examine them, and, upon being found correct, telegraph immediately (Central all O. K.). We do not doubt the bonds, but, coming to us through strange parties, we use this as a precaution, and not willing to take any risk.

"Respectfully yours,
"DONALDSON & FRALEY."

This letter was received by plaintiffs at New York on Monday, the 29th of May, a short time before the bonds were pre-

sented by the messenger of the Bank of North America for delivery to plaintiffs, and prior to defendants' draft for $15,375, which was presented at the same time as the bonds, as hereinafter stated.

5. On the 29th of May, Monday, the messenger of the Bank of North America, with the bonds, fifteen in number, and the draft of defendants for $15,375, appeared at the office of plaintiffs in New York, to deliver said bonds and collect said draft.

Plaintiffs had, on the said twenty-fifth day of May, sold the bonds " to arrive " to. Rasmus & Lissignola, bankers and stock-dealers in New York, engaging to deliver them four days thereafter.

When the messenger of the Bank of North America arrived at the office of plaintiffs, with the bonds and draft, it lacked but five or ten minutes of the hour after which, by the rules of the New York stock board, deliveries of bonds and stocks sold could not be made for that day.

Utley, therefore, without examining the bonds, went hurriedly with the bank-messenger to the office of Rasmus & Lissignola, to be in time for delivery that day. Arriving there with the messenger of the bank, he asked Rasmus to examine the bonds, saying he had not had time to do so. Rasmus opened and briefly examined the bonds; said they seem to be correct; and, at the request of Utley, gave the messenger of the Bank of North America Rasmus & Lissignola's check for the amount agreed between them and plaintiffs, $15,403.12, which check was paid.

On the same day, and after the delivery of the bonds as above stated, plaintiffs wrote and mailed letter to defendants as follows : —

"NEW YORK, May 29, 1871.

"MESSRS. DONALDSON & FRALEY, St. Louis:

"DEAR SIRS, — Yours of 25th, and 15 thousand Centrals, with draft, received. The Centrals all correct, and we telegraphed you to that effect.

"Respectfully yours,

"UTLEY, DOUGHERTY, & SCOTT."

7. On the same day plaintiffs. sent telegraphic despatch to defendants, as follows : —

"New York, May 29, 1871.
" To DONALDSON & FRALEY:
" Centrals all right.

"UTLEY, DOUGHERTY, & SCOTT."

. 8. On receipt of this despatch by Donaldson & Fraley, on the 29th or 30th of May, they informed Mr. Nichols, cashier of the Commercial Bank, that the bonds were all correct; whereupon Donaldson & Fraley's check for $15,075 was charged up, and Newman & Havens were advised by the Commercial Bank, and remittance made to Newman & Havens.

9. On the 12th of June, 1871, information was for the first time received in New York, or elsewhere, that there were counterfeits of these bonds in existence.

On that day plaintiffs wrote and mailed a letter to defendants, as follows : —

"JUNE 12, 1871.
"Messrs. DONALDSON & FRALEY, St. Louis, Mo.:
" DEAR SIRS, — Yours of 8th and 9th and 3d, Leavenworth, from Bank North America, 5th from U. & C. received.

" Look out for counterfeit Central Pacific 6's. Some appeared on market to-day. . . .

" Respectfully yours,
" UTLEY, DOUGHERTY, & SCOTT."

10. On the next day, June 13, 1871, plaintiffs sent telegraphic despatch to defendants, as follows : —

"New York, June 13, 1871.
" To DONALDSON & FRALEY:
" Central Pacifics you sold us probably counterfeit. Trace your party. Bonds shipped to Europe; can't hear from them for several days.

" UTLEY, DOUGHERTY, & SCOTT."

11. On the same day, June 13, 1871, plaintiffs wrote to defendants, and mailed letter, as follows, viz. : —

· "JUNE 13, 1871.
"MESSRS. DONALDSON & FRALEY, St. Louis, Mo.:
" DEAR SIRS, — Yours of the 10th, &c. . . . We feel uneasy with regard to the genuineness of the Central Pacific 6's you sold us. The bonds have been shipped to Europe, and cannot be heard from for several days. In case your parties are doubtful, it would be

well to act at once as if the bonds are not genuine.  There has been no suspicion that there were counterfeits out until yesterday.

"Respectfully yours,

"UTLEY, DOUGHERTY, & SCOTT."

12. On June 13, defendants sent a telegraphic despatch to plaintiffs, as follows: —

"ST. LOUIS, June 13, 1871.

"To UTLEY, DOUGHERTY, & SCOTT:

"We refer you to our letter, May 25, in which we sold without risk.  Have purchased same day from Commercial Bank, and they from Newman & Havens, Leavenworth, without risk.  Will aid you all we can, if counterfeit.

"DONALDSON & FRALEY."

The bonds in question were sold by Rasmus & Lissignola, immediately after they purchased them, to parties who sent them to Europe, whence they were returned declared to be counterfeit, and returned to Rasmus & Lissignola, who immediately demanded repayment from Utley, Dougherty, & Scott, plaintiffs; whereupon, on July 12, plaintiffs sent a telegraphic despatch to defendants, as follows: —

"NEW YORK, July 12, 1871.

"To DONALDSON & FRALEY, St. Louis:

"The Central Pacifics bought of you in May are declared counterfeit.  We shall look to you for indemnity.

"UTLEY, DOUGHERTY, & SCOTT."

13. On the same day, July 12, 1871, plaintiffs wrote and mailed to defendants a letter, as follows: —

"NEW YORK, July 12, 1871.

"MESSRS. DONALDSON & FRALEY, St. Louis:

"GENTLEMEN, — We beg to inform you that the Central Pacific bonds we bought from you on 25th May last have been returned from Europe, and are declared counterfeit.  On behalf of the parties for whom we purchased the bonds we shall look to you for indemnity.  We do not consider that the terms of your letter of 25th May in any way precludes us from our recourse upon you, especially not, in view of the facts disclosed by your telegram to us of June 13, 1871.  We therefore telegraphed you to-day as follows: 'The Central Pacifics we bought of you in May are declared counterfeit.  We shall look to you for indemnity.'

"Yours truly,

"UTLEY, DOUGHERTY, & SCOTT."

14. On the 12th of July defendants wrote and mailed to plaintiffs a letter, as follows:—

"St. Louis, July 12, 1871.

"Messrs. UTLEY, DOUGHERTY, & SCOTT,

"New York City:

"GENTLEMEN,—Your telegram received, in which you state that the Central Pacifics are counterfeit, and that you look to us for indemnity. In my former letter on this subject we referred you to our letter of May 25, and again call your attention to it. Will you have the kindness to write to us in detail on what grounds you propose holding or looking to us for indemnity?

"An early answer will oblige, very respectfully,

"DONALDSON & FRALEY."

On the 3d of August, 1871, defendants wrote and mailed to plaintiffs a letter, as follows:—

"St. Louis, Aug. 3, 1871.

"Messrs. U., D., & S.:

"GENTLEMEN,—Mr. Fraley just returned from Madison to-day, hence the delay in answering yours of 25th. We are acting under legal advice, and must refuse to make any assignment of claim, as we are not aware yet that we have any.

"Respectfully yours,

"DONALDSON & FRALEY."

15. On the 8th of August, 1871, plaintiffs wrote and mailed to defendants a letter, as follows:—

"NEW YORK, Aug. 8, 1871.

"Messrs. DONALDSON & FRALEY, St. Louis, Mo.:

"GENTLEMEN,—We have yours of 3d inst., and regret that you do not give us any more satisfactory information. You will allow us to remind you that we paid your draft for $15,375, and received therefor nothing but counterfeit bonds. In answer to our despatch to you that counterfeit Central Pacifics had appeared in the markets, you sent us a telegram, referring us to your note of 25th May, and saying, at the same time, 'Will aid you all we can, if counterfeit.' Setting aside all questions of legal liability, we submit to your sense of fair dealing, whether you are fulfilling this pledge. You now refuse to make an assignment of any claim you may have against the parties from whom you received the bonds, and assign as the reason for such refusal that you are under legal advice, and do not know whether you have any claim. But we

do not ask you to guarantee that you had any claim, and it seems to us that the fact of your being under legal advice is no reason why you should not do every thing in your power to help us in recovering the money you have had from us for worthless bonds, but rather a reason why you should help us the more readily. We beg to ask from you a full statement of the precise position you occupied in relation to these bonds; and, if this will aid us in our efforts to make good our loss, you ought to be thankful, and also willing, to give us any rights you have against these parties.

" Yours truly,

" UTLEY, DOUGHERTY, & SCOTT "

16. On the 12th of August, 1871, defendants wrote and mailed to plaintiffs a letter, as follows: —

" ST. LOUIS, Aug. 12, 1871.
" Messrs. U., D., & S. :

"GENTLEMEN, — In reply to your letter regarding the position we have taken, we can only say, that, when you consider the cir-cumstances connected with same, we think that you or anybody would act likewise; viz., Some time in May the Commercial Bank called on us and offered the bonds, and we made a bid. The cashier then informed us that the inquiry came from Newman & Havens, Leavenworth, and they would telegraph to them the bid we made to the Commercial Bank. In short time answer to Com-mercial Bank from Newman & Havens, that they would accept the bid, and had forwarded bonds to Commercial Bank. Upon arrival of bonds at the Commercial Bank, they received a letter from Newman & Havens, stating that they had never dealt in like bonds, and they were selling them for strange parties, consequently sell them without recourse. The Commercial Bank tendered us the bonds under same condition; and we refused to purchase bonds in the manner presented, but gave the Commercial Bank a check under the following conditions, — not to charge the check against us until we had been informed by you that the bonds were O. K. We then forwarded the bonds, and wrote you precise, that we had not ever handled any of the bonds, and we sell them with-out recourse, and particularly asked you to examine them, and more distinctly said, we sell without recourse as to genuineness, as they come from strange parties, and use this precaution, not willing to take any risk whatever. Upon receipt of the bonds, you tele-graphed us, ' Centrals all right,' and also wrote by mail, confirm-ing your despatch, by saying, received bonds and draft, and found

them all correct. When we received this information, we then informed the Commercial Bank to charge up check, which they did, and at the same time credited Newman & Havens; and we are furthermore informed, the parties of whom Newman & Havens purchased did not call for the money within ten days after this information of bonds being correct. Now, you see plainly that you are all to blame. Had you used the necessary precaution in examining the bonds, specially when your attention was called by us selling without risk, not only would none of us have any trouble or unpleasantness, but would have caught the thieves and brought them to justice. Now, please inform us what else could we have done. It shows that we acted prudently and with care. It is true, you may say, you received the bonds before the letter; but even and more so should you have examined them, and informed us. You are aware that New York is the market to detect all irregularities in the bonds spoken of, and you could easily have discovered, had you not been careless. Now, you plainly see our position. The Commercial Bank will not take them back from us, unless they are compelled to do so; and why should Donaldson & Fraley suffer for negligence of yours, when they used all precautions and measures at the time? It is true, it is hard for you to part with your money, but not more so than us, whilst we are in no manner to blame. Upon your information, confirming the genuineness of the bonds, we parted with the money received for the bonds. Should the Commercial Bank, or Newman & Havens, at any time come forward and offer to redeem the bonds, we certainly would be most happy, and be much better satisfied than the way it is now.

"Regarding our writing, that we would aid you all we could, did not infer that if you made a demand upon us for the money that we would pay same, but meant, that if it was in our power to make parties originally selling them replace them, we would do so; and we are more so willing now than ever; but we cannot concede nor agree to give you any claim against the Commercial Bank, whether we have legal right or not. It would certainly be admitting, on our part, that if we assign claim against Commercial Bank, that you certainly have likewise claim against Donaldson & Fraley, and also right to assign, which we really cannot admit, as we positively do not believe so. We are ready at any time to testify to the facts as they are, and were; and, should the law declare us wrong, we feel confident that Newman & Havens and Commercial Bank will abide by same; but under no circumstances will they

refund without action, as they firmly believe, as we do, that your claim is not just, under the circumstances.

" If you were right in your demands, tell us, in the name of the law, justice, or common custom, would we, or any dealer, receive from any stranger or honest party known to us, but not responsible, any securities to be sold on arrival in New York, and the funds to be credited upon sale and delivery in New York, and especially if sold under the conditions we sold bonds to you ? How would you have proceeded in this or any case ? The sum total is, you have made a mistake, and we are ready to assist you all we can to defend your claim, if you have any. We now refer you to our last letter, in which we informed you that we would rather you would begin action immediately, in order to have things settled and the suspense removed. What we have written we will enter as evidence, and has been written with consent of Commercial Bank, as they are fair and honorable.

" Trusting you now plainly see our position, and we feel sanguine, that, were you placed in our position, you certainly would not have acted differently,

" Yours, friendly,

" DONALDSON & FRALEY."

17. Utley (plaintiff) subsequently, in September, 1871, stated to defendants, when asked, in view of defendants' letter of May 25, 1871, which he admitted having received, why he did not examine the bonds with care before paying for them, that he received similar letters from the country every day, and that he supposed defendants were cautious only because they had not handled any of these bonds before.

18. The money paid by Donaldson & Fraley by their check to the Commercial Bank, and by it to Newman & Havens, was not, according to the statement of Newman & Havens to Nichols, cashier, called for, nor paid by Newman & Havens at Leavenworth, Kansas, to the party who sold the bonds to Newman & Havens, for two or three weeks after it was received by Newman & Havens from the Commercial Bank.

19. Before writing the letter of May 25, 1871, hereinbefore set out, and transmitting the bonds to New York, the defendants, who had never seen any Central Pacific bonds, took said bonds, or some of them, to two banking establishments in the city of St. Louis, and asked one of the officials of each of said banks

whether they knew about them, but was informed that they did not, as those bonds were not known or dealt in in this market.

20. Both the plaintiffs and defendants were brokers and stock-dealers, the former in New York and the latter in St. Louis, and were business correspondents of each other.

21. That the bonds sold by defendants to plaintiffs were spurious.

22. That the identical bonds sold by defendants to plaintiffs have been produced upon the trial by the plaintiffs, to be surrendered if they shall recover.

23. That the defendants, when they sold and delivered the bonds to plaintiffs, did not know or believe that the bonds were forged or spurious, and they did not know this until informed thereof by the plaintiffs on June 12, 1871, as hereinbefore stated; and their only knowledge of the bonds prior to the sale and delivery thereof appears from the facts hereinbefore set forth.

Upon the foregoing facts the court found as a conclusion of law that the defendants were entitled to judgment; to which finding and conclusion of law the plaintiffs then and there excepted.

Judgment having been rendered for the defendants, the plaintiffs sued out this writ of error.

*Mr. Charles M. Da Costa* for the plaintiffs in error.

The judgment below is not warranted by the facts contained in the special finding, and must be reversed. *Prentiss* v. *Zane*, 8 How. 470; *Graham* v. *Bayne*, 18 id. 60.

The contract between the parties was effected and concluded by their telegraphic correspondence of May 25, 1871. By that contract the defendants impliedly warranted the genuineness of the bonds sold and to be delivered thereunder.

The letter of May 25, 1871, written by the defendants to the plaintiffs, after the making of the contract, and received by them on the 29th May, and the acts and doings of the plaintiffs on its receipt, neither released the defendants from such warranty, nor amounted to a modification in that respect of the contract as originally entered into

*Mr. William Patrick, contra.*

The contract between the parties was not completed by the telegrams. The letter of the defendants to the plaintiffs, dated May 25, 1871, was written contemporaneously with the telegrams of that date, and was intended to be, and in law should be, read as a part of the acceptance of plaintiffs' offer. It is clear from that letter, that, at the time of sending their telegram, the defendants had no intention of selling the bonds, except without recourse as to genuineness.

Should the court rule against this point, then it is insisted that the letter of May 25, and the delivery tendered under the terms thereof, together constituted a proposition to modify the terms of the contract entered into by telegraph; that plaintiffs had the right in law either to stand by the original contract and reject the proposed modification, or to accept it without new or additional consideration; that, having accepted the delivery tendered under the terms of that letter, they are in law to be regarded as having waived any other or different performance from that tendered, and to be now estopped from claiming that they did assent to the modification of the contract, or the performance tendered and received.

Assuming that the telegram of plaintiffs' offering $102\frac{1}{2}$, and the telegram of defendants accepting that offer, constituted the contract, there can be no question but that the delivery tendered under the letter of May 25 was in effect a refusal by defendants to fulfil that contract, unless plaintiffs would agree to modify it.

After an agreement has been reduced to writing, it is competent for the parties at any time before breach of it, by a new contract not in writing, either to altogether waive, dissolve, or annul the former agreement, or in any manner to add to or subtract from, or vary, or qualify, the terms of it, and thus to make a new contract. *Gross* v. *Lord Nugent*, 5 Barn. & Ad. 65; *Lawrence* v. *Dole*, 11 Vt. 549; *Medemak Bank* v. *Curtis*, 24 Me. 36.

And when before breach a new contract is substituted for a previous one, no consideration is necessary if the substituted

contract has become executed. *Lawrence* v. *Dole, supra; Young* v. *Hunter*, 2 Seld. 207.

Plaintiffs having acted on the letter of May 25, and accepted the delivery tendered, thereby waived a different performance. *Shields* v. *Pettee*, 2 Sandf. 262; *Reed* v. *Randall*, 29 N. Y. 358.

Acceptance is a question for the jury, *Corning* v. *Colt*, 5 Wend. 256; and, having been found as a fact by the court below, its finding is conclusive.

Plaintiffs, by accepting the performance tendered, put it out of the power of defendants to make other performance.

A party whose acts prevent the performance of a condition cannot avail himself of such non-performance as a ground of action. His acts estop him. *Young* v. *Hunter, supra; Richardson* v. *Cooper*, 25 Me. 450.

Where a loss must fall on one of two innocent persons, it must be borne by him whose conduct occasioned it.

In the case at bar, defendants notified plaintiffs that the bonds came to them from strange hands, that they had never before handled any of them, that they were unwilling to take any risk, and would only sell without recourse as to genuineness; consequently, they requested the plaintiffs to " please examine them," and, upon being found correct, telegraph immediately (Centrals all O. K.). Plaintiffs received this notification before the bonds, failed to make an examination, but telegraphed defendants, and also wrote them, " Centrals O. K." They cannot now contravene the statement thus made and relied on, without fraud on their part and injury to another. *Dair* v. *United States*, 16 Wall. 1.

The court below finds that both plaintiffs and defendants were innocent parties, and that in view of these facts the loss arising from the bonds turning out to be spurious should fall upon the plaintiffs, as the conduct of defendants had been fair and admonitory, and that of plaintiffs grossly negligent.

Defendants parted with their money under the same circumstances as plaintiffs, but on the faith of the acceptance of the bonds by plaintiffs under the letter of May 25, 1871, and plaintiffs' letter and telegram that the Centrals were " O. K."

The rule of law under this head clearly upholds the finding of the court below. *Dair* v. *United States, supra ; Butler* v. *United States,* 21 Wall. 272.

MR. JUSTICE SWAYNE delivered the opinion of the court.

This is an action at law, brought by the plaintiffs in error. The case was submitted to the court without the intervention of a jury, pursuant to the act of Congress of March 3, 1865, 13 Stat. 501.

The court found specially.

The question presented for our determination is whether the facts found are sufficient to support the judgment. Those facts are neither voluminous nor complicated.

On the 24th of May, 1871, Newman & Havens, bankers, of Leavenworth, telegraphed to Nichols, the cashier of the Commercial Bank of St. Louis, to "get rate for $15,000 California Central Pacific Railroad bonds, delivered to-morrow." The defendants offered "100½." Newman & Havens accepted by a telegraphic despatch. On the 25th of May Cashier Nichols received from Newman & Havens the bonds, and also a letter, in which they said, "The party selling these bonds is waiting here to get the money for them. He is an entire stranger to us." "We desire them sold without any recourse on us." On the same day Cashier Nichols showed this letter to the defendants, and proposed to deliver the bonds without recourse. They refused to receive them on such terms, but offered to take them, and pay for them when ascertained to be good; otherwise, to return them. The cashier acceded to this proposition. On the 24th of May the defendants telegraphed to the plaintiffs, who were brokers in the city of New York, "Make best bid for fifteen Central Pacifics, quick." The plaintiffs answered, on the 25th of May, that they would buy at 102½. Their despatch to this effect reached the defendants about ten A.M. the same day. The defendants answered by despatch on that day, "We accept your offer." The bonds were delivered by the cashier to the defendants on the 25th of May, and were by them forwarded by express on that day to a bank in New York, with a draft on the plaintiffs for $15,375, the bonds to be handed over on the payment of the draft. On

the morning of that day the defendants addressed a letter to the plaintiffs, which is the hinge of this controversy. It is as follows: —

"In accordance with your offer for 15 Central Pac. 1st mort. bonds, 102½, we replied, 'We accept your offer, and have forwarded them by ex. to Bank North America, with draft attached for $15,375. We would further add, that we have purchased the bonds from a party strange to us; and, not having ever handled any of the Pacific Central, we would sell the bonds without recourse as to their being genuine; consequently, please examine them, and, upon being found correct, telegraph immediately (Central all O. K.). We do not doubt the bonds, but, coming to us through strange parties, we use this as a precaution, and not willing to take any risk."

This letter reached the plaintiffs on the 29th of May, a short time before the draft and bonds were presented. The plaintiffs had sold the bonds "to arrive" to Rasmus & Lissignola. They could not be delivered after two o'clock. It was within a few minutes of that time when the messenger of the bank presented himself. One of the plaintiffs went with the messenger to the office of their vendees, and requested Rasmus to examine the bonds. He did so, said they seemed to be correct, and thereupon gave a check for the amount his firm had agreed to pay for them. This check was duly paid. On the same day the plaintiffs wrote to the defendants, "The Centrals all correct, and we telegraphed you to that effect." Such a despatch had been sent. Upon receiving it, the defendants paid the bank for the bonds, and the money was remitted by the bank to Newman & Havens. On the 12th of June information was received for the first time in New York, or elsewhere, that there were in existence counterfeits of such bonds. On that day the plaintiffs wrote to the defendants, "Look out for counterfeit Central Pacifics; some appeared on market to-day." On the next day the plaintiffs telegraphed to the defendants, "Central Pacifics sold us probably counterfeit. Bonds shipped to Europe. Can't hear from them for several days." On the same day the plaintiffs wrote to the defendants to the same effect, and said further: "In case your parties are doubtful, it would be well to act at once as if the bonds were

not genuine. There has been no suspicion of counterfeits until yesterday." On the same day, June 13, the defendants replied by despatch : " We sold without risk. Have purchased same day from Commercial Bank, and they from Newman & Havens, of Leavenworth, without risk." The bonds were counterfeit, and the plaintiffs refunded to Rasmus & Lissignola the amount they had paid. On the 12th of July the plaintiffs telegraphed to the defendants, " The Central Pacifics bought of you in May are declared counterfeit. We shall look to you for indemnity." On the same day the defendants replied by telegraph, and asked upon what ground it was proposed to hold them liable. Some subsequent correspondence took place between the parties, which it is unnecessary to refer to in detail. The plaintiffs asked a transfer of the claim of the defendants, whatever it might be, but without guarantee, against the bank. This the defendants refused to give. The money paid to Newman & Havens by the bank was not called for by the party from whom they received the bonds for two or three weeks after the money was paid to them.

Before examining the case in its strictly legal aspects, it is proper to make several remarks suggested by the facts as found.

1. The defendants sold the bonds absolutely by their despatch of the 25th of May. The qualification insisted upon was, by their letter of that date, received by the plaintiffs on the 29th. If the defendants intended to qualify, it should have been done in the despatch. This would have given the plaintiffs notice in time for reflection before the presentation of the draft, might have prevented their selling the bonds before the letter was received, and would have enabled them to avoid the hurry and confusion incident to the payment of the draft and the delivery of the bonds to their vendees. If the draft had not been paid at sight, it would doubtless have been protested.

2. The circumstances attending the purchase of the bonds by the defendants are shown in our analysis of the facts of the case. The statement in the letter upon the subject is not accurate.

3. They refused upon any terms to put the plaintiffs in

their place with respect to any claims they might have against the Commercial Bank.

4. They were notified on the 12th of June that the bonds were counterfeit. If they had thereupon at once caused Newman & Havens to be advised also, it is not improbable that the latter would have retained the funds, and thus have saved from loss all the honest parties through whose hands the bonds had passed. The defendants failed to take any step whatever in this direction.

It cannot be questioned that the despatches between the parties on the 25th of May constituted a complete contract of sale, upon the condition or with an implied warranty, which it is not material here to consider, that the bonds were genuine. Nor can it be doubted that, if the bonds had been delivered without any thing further occurring, the defendants, upon the bonds proving to be counterfeit, would have been liable in this action. *Taylor* v. *Merchants' F. Ins. Co.*, 9 How. 390; Benjamin on Sales, 56; *Flyn* v. *Allen*, 57 Penn. St. 482; *Webb* v. *Odell et al.*, 49 N. Y. 583.

Was this contract changed so that this condition or warranty was waived by the plaintiffs? In other words, did the letter of the defendants propose the modification insisted upon, of the pre-existing contract, and if so, did the plaintiffs agree to it, and accept the delivery of the bonds accordingly?

We pass by without remark the plaintiffs' propositions that the alleged modification was within the Statute of Frauds, and could not, therefore, be effectually accepted otherwise than in writing; that there was no consideration for such an agreement; and that, if made, it was contrary to public policy, and therefore void. The view which we take of the case renders it unnecessary to consider either of these points.

The first sentence of the letter relied upon by the defendants recognizes distinctly the contract as made by the despatches. The defendants say: "In accordance with your offer for 15 Central Pac. first mort. bonds, 102½ we replied, We accept your offer, and have forwarded them by ex. to Bk. North America, with draft attached for $15,375."

This, standing alone, would have been a mere carrying out of the contract as made, and as it must have been understood by

both parties. The stress of the case is upon what follows. The letter proceeds: " We would further add, that we have purchased the bonds from a party strange to us." They had in fact bought them from the Commercial Bank, but were not to take them unless genuine, and were not to pay for them until found to be so. Next: " And not having ever handled any of the Pacific Central, we would sell the bonds without recourse as to their being genuine; consequently, please examine them, and, upon being found correct, telegraph immediately (Central O. K.)." The phrase, " we would sell without recourse," considered in the light of the context and the circumstances, may well be interpreted to mean that the writers would prefer or like so to sell, if it could be done. This view derives support from the succeeding member of the sentence, " please examine," &c. Examine for whom? It is not said, examine for yourselves. The language employed is usual where the thing asked is for the benefit of the asker, but not where it is for the benefit of the party addressed. Lastly, it is said: " We do not doubt the bonds, but, coming through strange hands, we use this precaution, and are not willing to take risk." This is consistent with the construction we have given to the preceding clause. If the examination the plaintiffs were requested to make showed clearly that the bonds were not counterfeit, then there could be no risk, whether the sale was with or without warranty of genuineness. In connection with these views, it is to be observed that while the bonds and draft were sent on pursuant to the original contract, which is distinctly recognized, it is not said in the letter in plain terms, such as would naturally have been used if such had been the intent of the writers. We will sell only at your risk as to genuineness. We will not guarantee it : examine for yourselves. If the bonds are counterfeit, and you take them, the loss will fall upon you, and not upon us. If this language, or terms equally clear and explicit, had been used, the case would have presented a very different aspect. " Every intendment is to be made against the construction of a contract under which it would operate as a snare." *Hoffman* v. *Ætna Ins. Co.*, 32 N. Y. 405.

Upon the whole letter, considering what it does and what it

does not contain, we are unable to come to the conclusion that the defendants intended to require that the modification since insisted upon should be made, and to make such modification the condition upon which the plaintiffs should take the bonds, if they took them at all. This result leaves the rights of the parties as they were under the original contract, and entitles the plaintiffs to recover.

But conceding for the purposes of this opinion that the letter did contain such a proposition or annunciation as is insisted upon, then the inquiry arises whether it was so understood and agreed to by the plaintiffs.

There can be no contract without the mutual assent of the parties. This is vital to its existence. There can be none where it is wanting. It is as indispensable to the modification of a contract already made as it was to making it originally. Where there is a misunderstanding as to any thing material, the requisite mutuality of assent as to such thing is wanting; consequently the supposed contract does not exist, and neither party is bound. In the view of the law in such case, there has been only a negotiation, resulting in a failure to agree. What has occurred is as if it were not, and the rights of the parties are to be determined accordingly.

In *Phillips* v. *Bistotti*, 2 B. & C. 511, the defendant was a foreigner, and understood the English language imperfectly. Certain jewelry was struck off to him at auction for eighty-eight guineas. He was sued for that amount, and set up as a defence that he thought he had bid forty-eight guineas. Abbot, C. J., left it to the jury to find whether the mistake had actually occurred, " as a test of the existence of the contract." Benj. on Sales, 43.

In *Baldwin et al.* v. *Middleburger*, 2 Hall, 176, the defendant bought merchandise of the plaintiff, and it was agreed that it should be paid for by the note of a third person payable to the defendant, to be by him indorsed to the plaintiff. After the goods were delivered the note was tendered, indorsed without recourse. The plaintiff refused to receive it, insisting that the agreement was that the note should be indorsed without this qualification, and thereupon brought the suit. The court left it to the jury to find whether there was a misunderstanding

between the parties as to the manner of the indorsement. The jury so found; and it was held that the plaintiff was entitled to recover as if there had been nothing said about the note, there being no such assent of the two minds as was necessary to make a contract in relation to it.

In *Coles* v. *Browne*, 10 Paige, 526, a block of lots was struck off at auction to the defendant. The plaintiff insisted and proved that the sale was of the lots separately. The defendant insisted that his bid was for the entire block as one parcel, and that he so understood the premises to be offered and sold. The vendor instituted the suit for specific performance. The evidence rendered it doubtful whether the defendant's allegations as to his understanding and bid were not true, and upon that ground the Chancellor dismissed the bill. If there was a misunderstanding on the subject between the parties, there was clearly no contract. See also *Calverly* v. *Williams*, 1 Ves. Jr. 210; *Saltus* v. *Pryn*, 18 How. (N. Y.) Pr. 512; *Bruce* v. *Pearson*, 3 Johns. (N. Y.) 34; *Crane* v. *Portland*, 9 Mich. 493; 2 Pars. Contr. (4th ed.) 475 *et seq.*

It is essential to the validity of a contract that the parties should have consented to the same subject-matter in the same sense. They must have contracted *ad idem*. *Hazzard* v. *N. E. M. Ins. Co.*, 1 Sumn. 218.

"Where a written agreement exists, and one of the parties sets up an arrangement of a different nature, alleging conduct on the other side amounting to a substitution of this arrangement for the written agreement, he must clearly show, not merely his own understanding as to the new terms of arrangement, but that the other party had the same understanding." *Darnley* v. *The Proprietors, &c.*, 2 Law Rep. H. L. 43, 60.

The plaintiffs were not asked to assent expressly with respect to the waiver of the warranty, if it were demanded, and made no such answer. They were asked to "please examine," &c., and to telegraph the result. This they did. The despatch was wholly silent as to any thing else. That they understood the waiver was demanded as a *sine qua non* in no way appears. On the other hand, the contrary is clearly manifest. The moment they had reason to apprehend that the bonds might be

counterfeit, they notified the defendants; and, as soon as it became certain they were so, the defendants were advised of the fact, and that they would be looked to for indemnity. The defendants denied their liability by reason of their letter. In due time this suit was brought. Conceding that both parties have acted in good faith, it is clear that there was a misunderstanding between them as to the meaning and effect of the letter, and that the plaintiffs never understood and agreed to it as it is now interpreted and insisted upon by the defendants. The *aggregatio mentium* requisite to give that interpretation effect was, therefore, wanting.

To constitute the abandonment of a contract, the act must be mutual. *Robinson* v. *Page*, 3 Russ. 122.

It has been held that, to make a negotiation for the modification of a contract effectual, it must appear that it was the intention of the party proposing it wholly to abandon the original contract, if the modification proposed were not assented to. *Murray* v. *Harway*, 56 N. Y. 347; *Robinson* v. *Page, supra.*

"A waiver of a stipulation in an agreement, to be effectual, must be made intentionally, and with knowledge of the circumstances." *Darnley* v. *The Proprietors, &c., supra; Howard et al.* v. *Carpenter,* 2 Md. 259.

When one party assents to a contract, relying upon the representations of the other, his assent is given upon the condition that the representations are true. *Duncan* v. *Hoge*, 24 Miss. 671.

*Judgment reversed, with directions to the court below to render a judgment for the plaintiff in error.*

MR. JUSTICE STRONG, with whom concurred MR. JUSTICE CLIFFORD and MR. JUSTICE HUNT, dissenting.

I dissent from the judgment given in this case. Before the plaintiffs received the bonds, and before they accepted or paid the draft drawn upon them by the defendants, they were notified that the defendants would sell without recourse, and that they were unwilling to run any risk. They were requested to examine, and telegraph to the defendants whether the bonds were genuine, and this as a precaution of the defendants against

risk. The letter of the defendants clearly manifested an intention not to deliver the bonds unless they were genuine, or unless the plaintiffs would take them at their own risk. On any other terms the plaintiffs had a right to take them. Inquiry and notice to defendants afterwards would have been idle, and would have been no precaution. Consequently the receipt of the bonds by the plaintiffs, after the notice given to them, can have no other meaning than that they took them at their own risk.

MR. JUSTICE DAVIS did not sit in this case.