John W. Donaldson et al., Appellants, *v.* Henry S. Newman et al., Respondents.

### June 15, 1880.

1. Where, in response to an inquiry as to the value of certain bonds, one makes an offer by telegram, to which the inquirer answers, "All right; bonds forwarded by express to-day," this constitutes a contract of sale, with an implied warranty that the bonds are genuine.

2. The subsequent acts and correspondence of the parties in this case held not to so modify the contract as to amount to a waiver of the implied warranty.

3. In order to relieve one of responsibility on the ground of agency, he must show that he disclosed his principal at the time of the contract.

4. The Statute of Frauds, to be of avail, must be specially pleaded.

Appeal from the St. Louis Circuit Court, Thayer, J. *Reversed and remanded.*

Patrick & Frank, for the appellants: The Statute of Frauds must be pleaded. — *Cahill* v. *Bigelow*, 18 Pick. 372 ; *Gist* v. *Eubank*, 29 Mo. 248 ; *Gardner* v. *Armstrong*, 31 Mo. 539 ; *Sherwood* v. *Saxton*, 63 Mo. 84 ; *Graff* v. *Foster*, 67 Mo. 521. The telegraphic correspondence of the parties constituted a valid and binding contract. — *Cunningham* v. *Ashbrook*, 20 Mo. 556 ; *Bass* v. *Walsh*, 39 Mo. 197 ; *Goddard* v. *Foster*, 17 Wall. 142 ; *Koehring* v. *Menninghoff*, 61 Mo. 407. The principal's name must be disclosed at the time of the contract in order to relieve the alleged agent. —*Nash* v. *Town*, 5 Wall. 703 ; *McLellan* v. *Parker*, 27 Mo. 162 ; *Thompson* v. *McCullough*, 31 Mo. 225 ; *Higgins* v. *Dellinger*, 22 Mo. 299. The contract, being complete, was not affected by the subsequent acts of the seller. — *Schuchardt* v. *Allens*, 1 Wall. 369. The contract of sale carried with it an implied warranty that the bonds were genuine. —*Utley* v. *Donaldson*, 94 U. S. 46.

Glover & Shepley, for the respondents: The so-called contract is void under the Statute of Frauds. — Browne on

Stat. Fr., sect. 505; *Wildbahn* v. *Robidoux*, 11 Mo. 660; *Chapman* v. *Plummer*, 1 Bos. & Pul. 252; *Waterman* v. *Meigs*, 4 Cush. 497; *Wright* v. *Dannah*, 2 Camp. 203; *Klintz* v. *Swinney*, 5 Esp. 267; *Vredenburg* v. *Spooner*, L. R. 1 Exch. 319; *Bailey* v. *Ogden*, 3 Johns. 399; *Coddington* v. *Goddard*, 16 Gray, 442, 443.

BAKEWELL, J., delivered the opinion of the court.

This action is for the breach of an implied warranty arising upon a sale of certain bonds which proved to be forged. Plaintiffs were stock-brokers in St. Louis, and defendants bankers at Leavenworth, Kansas. It appears from the evidence that a man calling himself Thomas Scott called, on May 24, 1871, at the bank of defendants in Leavenworth, and represented that he had fifteen Central Pacific bonds of $1,000 each which he wished to sell. He said that he desired to invest in Kansas lands; that he had brought the bonds from New York, but did not want to sell unless he made the investment; that it would be difficult for him to sell the bonds in the interior of the State, and that he desired to sell them in Leavenworth. Defendants replied that they had never handled these bonds, and knew nothing about them, and suggested that they would telegraph to their correspondent in St. Louis to know what the bonds were quoted at. Scott requested defendants to telegraph, and paid for the message, which was sent to the Commercial Bank, of which Nichols was cashier. No other transaction in bonds had previously taken place between defendants and the Commercial Bank, which was their correspondent in St. Louis. The dispatch was signed by defendants, addressed to the Commercial Bank, and was as follows: "Get rate for $15,000 California Pacific bonds, delivered to-morrow." On receiving the dispatch, Nichols took it to plaintiffs, who wrote at the bottom of it, "Will give 100½ for fifteen Central Pacifics." Nichols at once telegraphed to defendants, "100½ bid for Central Pacifics;" and the same day

received a dispatch from defendants, "All right; bonds forwarded by express to-day." This dispatch Nichols showed to plaintiffs, telling them that defendants had accepted their bid. Whilst these dispatches were passing, Scott was in the bank at Leavenworth, and sanctioned what was done. Plaintiffs on the same day telegraphed to Utley & Co., brokers in New York, and their correspondents in that city, " Make best bid fifteen Central Pacifics, quick." To this dispatch they received an answer next morning, " We will buy Central Pacific 1sts at 102½." This they answered at once by telegraph, " We accept offer $15,000 Central Pacific 1sts for 102½." On the same day (25th), before noon, Nichols received by express from defendants fifteen papers purporting to be Central Pacific bonds, but which afterwards proved to be counterfeits, and with the bonds a letter from defendants, addressed to him as cashier, dated Leavenworth, May 24th, as follows : " We this A. M. telegraphed you as follows : ' Get rate for $15,000 California Central Pacific R. R. bonds delivered to-morrow.' Same is hereby confirmed. We herewith hand you bonds. Please close the transaction and telegraph us immediately. The party selling these bonds is waiting here to get the money for them. This same gentleman is an entire stranger to us, therefore you will be kind enough to satisfy yourself that the bonds are all right. We desire them sold without any recourse on us. Your early attention will much oblige." On receipt of this letter and the bonds, Mr. Nichols at once took them to the office of plaintiffs and handed them to Mr. Fraley without remark. On reading the letter, Fraley said that he would not take the bonds that way ; that he would not take the bonds without recourse ; that they never did so. To quote Fraley's testimony, which is corroborated by Nichols : " I stated to Nichols that we had sold the bonds in New York to Utley, Dougherty & Scott, at such and such a price, and that we were bound to make the delivery in order to make our contract good ; I insisting upon Mr. Nichols making

good his contract made for Newman & Havens with us by telegram of May 24, for the reason we had sold the bonds and were bound to deliver." After he had handed the bonds and letter back to Nichols, Fraley says Nichols stood there hesitatingly, and Fraley said to him, " I will tell you what I will do : I will send these bonds ; but since there is a question of doubt raised — as they came from strangers, according to the terms of this letter — we will send the bonds to New York, and call their attention to these facts, and in the meantime, for safe-keeping, I will give you a check, and if they telegraph back that these bonds are all O K, why, you can charge up the check to us and credit Newman & Havens. But at the same time I made the remark repeatedly that I wanted it strictly understood that we didn't buy any bonds without recourse ; and my object in giving Mr. Nichols the check, and in closing it in that way, was to take advantage of the doubt, so that in case the bonds should be counterfeit, why then we wouldn't need to go back on Newman & Havens to get our money. So we took the safe side, and kept the bonds and money until we heard from New York. * * * I said, you must not charge the check up to us until we get a telegram from New York saying that those bonds are genuine, and we will ask those parties in New York to have the bonds examined before they even pay us." To this Nichols agreed, and Donaldson & Fraley at once gave him their check for $15,075, on which Mr. Nichols wrote in pencil, " Credit Newman & Havens if bonds are reported all right in New York." Plaintiffs at the same time handed the bonds to Nichols, to be forwarded to New York, together with a draft on Utley & Co. for $15,375 for collection, and Nichols forwarded the bonds at once to New York, to be delivered to Utley & Co. on payment of the draft. Meanwhile Utley & Co., on the 24th, had written to plaintiffs, " Your telegram of to-day received. You have sold us $15,000 Central Pacific 6s at 100½ flat." On the afternoon of the 25th, plaintiffs wrote to Utley & Co.

as follows : " In accordance with your offer for fifteen Central Pacific 1st mort. bonds, 102½, we reply, we accept your offer, and have forwarded them by ex. Bank of North America, with draft attached for $15,375. We would further add that we have purchased the bonds from a party strange to us, and not having ever handled any of the Pacific Central, we would sell the bonds without recourse as to their being genuine. Consequently, please examine them, and upon being found correct, telegraph immediately ' Central all O K.' We do not doubt the bonds, but, coming to us through strange parties, we use this as a precaution, and not willing to take any risk."

On May 25th, Nichols telegraphed to Newman & Havens, " No one here knows anything about bonds. Parties sold to, have shipped to New York. Soon as heard from will telegraph you. Hold money till then." This dispatch was shown to Fraley before it was sent. Nichols on the same day wrote to Newman & Havens, " The bonds appear to be all right, but no one here knows for certain. The party that I sold to has shipped them to New York, with instructions to telegraph if all O K, and so soon as he is advised I will telegraph you." To these last communications Newman & Havens sent no reply.

On May 29th, Utley & Co. honored the draft of plaintiffs, thus paying for the bonds. On the same day they telegraphed to plaintiffs, " Centrals all right," and also wrote to them, saying : " Yours of the 25th and 26th and fifteen thousand Centrals with draft received. The Centrals all correct, and we telegraph you to that effect." On the same day the New York telegram was shown to Nichols, the check of plaintiffs was charged by the Commercial Bank to account of plaintiffs and credited to Newman & Havens, and on the next day Newman & Havens received a telegram from Nichols, " California Central Pacific bonds reported O K." Scott had then left Leavenworth. He left as soon as he was informed that the bonds had been sent to New

York, remarking that he did not want the bonds sent to New York; that he could have sent them there himself. He said, on leaving, that he would be back in a few days. He was gone more than five days, and returned looking much sunburnt, saying he had been looking at land in the interior. On his return he conversed about half an hour about his trip before asking about his bonds. When informed that the money had been collected, he requested to be paid in currency, and received $15,000, $75 being retained by Newman & Havens as their commission. He has never been seen since.

On June 13th, Donaldson & Fraley received from Utley & Co. the following dispatch : " Central Pacifics you sold us probably counterfeit. Trace your party. Bonds shipped to Europe. Can't hear from them for several days." To which they at once replied by telegraph, " We refer you to our letter of May 25th, in which we sold without risk. Have purchased same day from Commercial Bank, and they from Newman &, Havens, from Leavenworth, without risk. Will aid you all we can if counterfeit."

Nichols, on June 19th, wrote to Newman & Havens as follows : " I do not know that the Central Pacifics are counterfeit, and hope that they are not. The party that bought them here did everything they could, and sold them without recourse, and I do not believe that the New York party can make them take them back, even if they are counterfeit. But some people think that you cannot sell anything counterfeit. I would get posted about the party that you bought of, if you can. Some one did sell a lot of them in New York that is counterfeit, and that is probably the cause of the talk about them." To this Newman & Havens replied : " Your favor 19th inst. is received. We have sent to New York to make inquiries concerning the party for whom we sold the bonds, and will advise you of the result. We charged him one-half per cent for selling, and never owned the bonds at all. So, we presume, is the

position you occupy, as you did not give us proper credit for them until you had sold them. We do not believe, under these circumstances, that you or ourselves could be held.''

The bonds were afterwards received back by Utley & Co. as counterfeit. Utley & Co. sued Donaldson & Fraley in the United States Circuit Court for this circuit for the price paid for the bonds. The finding was for the defendants; but, on appeal, the Supreme Court directed the court below to enter judgment for plaintiffs. The case is reported in 94 U. S. 29. The judgment was satisfied by Donaldson & Fraley.

The cause was tried by the court without a jury. There was a finding and judgment for defendants.

The first question to be determined is, whether a contract of sale was consummated before the arrival in St. Louis of the letter of Newman & Havens accompanying the bonds. And we are of opinion that the sale was complete on the receipt of the second dispatch from Leavenworth. Even if the first telegram be regarded as a mere request to ascertain the market price in St. Louis of Central Pacific bonds, rather than a direction to the agent in St. Louis of the defendants to get a bid for a definite number of bonds, to be delivered next day, the offer is accepted by plaintiffs, in writing, on the bottom of the telegram, and defendants are at once informed of the amount of the bid, which they accept by telegram, announcing that they have forwarded the bonds.

Contracts for the sale of stocks are not made with the deliberation and formality usual in some other transactions. The value of property of this character is fluctuating, and varies, not only from day to day, but from hour to hour. The telegram from Leavenworth was regarded, both by Donaldson & Fraley and by Nichols, as an offer of fifteen shares, to be delivered on the morrow. A bid was made, and was at once accepted, with the information that the

stocks were on the way. The contract was a good common-law contract for the sale of these bonds.

It is said it did not satisfy the Statute of Frauds, and that no action could be maintained upon it, because there was no note or memorandum in writing signed by the parties to be charged with the contract. The rule in Missouri now is, however, — contrary to the earlier cases, — that one who would avail himself of the Statute of Frauds must especially insist upon it in pleading, or be deemed to have waived the benefit of its provisions. This was the common-law rule; and, notwithstanding the requirement of the Code that facts constituting the cause of action must be stated, it is held now in this State to be the subsisting rule. It may be difficult to see why the Statute of Frauds is new matter of defence, and why a general denial does not sufficiently raise the question, since the plaintiff, in proving his contract, must show it to be one not enforceable at law, if by the evidence it appears that it was within the terms of the statute, and that these terms have not been complied with. But the rule in New York is as we have stated it, and since the report of the case of *Hook* v. *Turner*, 22 Mo. 333, the New York rule has been followed in the later cases in Missouri. *Marston* v. *Swett*, 66 N. Y. 206; *Gardner* v. *Armstrong*, 31 Mo. 535; *Sherwood* v. *Saxton*, 63 Mo. 78.

The action here is for a breach of an implied warranty arising upon a contract of sale, and for failure of consideration. The petition sets forth the facts which are claimed to constitute the cause of action. The answer admits the sending of the telegrams and delivery of the bonds and receipt of the purchase-money, but claims that defendants were acting at the time as the agents of one Scott; that they disclosed their agency, and were not liable on the warranty arising from the contract. If the facts stated in the petition did not set forth a contract in writing valid under the statute, but set forth an oral promise, the question could

have been raised by demurrer. If the petition set out a promise without alleging whether it was oral or written, so that it did not appear that it was within the statute, a special plea of the statute should have been interposed. But where the point is not made by demurrer or answer, the defendant waives the benefit of the Statute of Frauds.

But the contract here was executed. On the next day, when Nichols called upon plaintiffs with the bonds, and with the letter of Newman & Havens, in which they state that, for reasons named, they desire to sell without recourse on them, plaintiffs insisted upon the agreement being carried out as already made, and refused to take the bonds without recourse. They insist that the bonds are theirs, and the money to be paid for them the money of Newman & Havens; but, in order to avoid all possibility of loss to any party, they propose that the bonds be sent on to New York for examination, their check deposited with the agent of Newman & Havens, and that the check be held up until an answer is received from New York. Nichols did not succeed in getting plaintiffs so to modify the agreement already made as to take the bonds without recourse, and he delivered them to Donaldson & Fraley, after their repeated statements that they would do nothing of the sort; and this was what Nichols construed the letter of Newman & Havens as authorizing him to do under the circumstances. But, if this was a departure from his instructions, he at once communicated to his principals his whole action in the matter, with all the circumstances, and they, by their silence, gave consent, and made no objection, from first to last, to any proceeding of their agent. If Newman & Havens thought that Nichols was departing from his instructions in delivering the bonds to parties who refused to purchase them without recourse, they might, had they cared to do so, have taken steps at once to stop the shipment of the bonds or their delivery in New York, or at least have manifested their dissent.

It is claimed that Newman & Havens were acting as agents, that their letters disclosed this, and that they should not be held to the liability of principals. But an agent is not relieved from responsibility because he does not intend to assume personal liability. If the name of the principal is disclosed, the question of intention may arise; but one who would excuse himself from responsibility on the ground of agency must show that he disclosed his principal at the time of the contract. *Winsor* v. *Griggs*, 5 Cush. 211.

We have not thought it necessary for the purposes of this opinion to set out the instructions given and refused. The case has been carefully argued, both orally and by written briefs, and these briefs and the record have been carefully considered. The case seems one of great hardship. The loss must fall somewhere. The majority of the Supreme Court of the United States held Donaldson & Fraley liable to the parties to whom they had sold the bonds in New York, notwithstanding the fact that before those parties received the bonds, and before they accepted the draft drawn on them by Donaldson & Fraley, they were notified that Donaldson & Fraley would sell without recourse and were unwilling to run any risk. "They were requested," as the dissenting judges say, "to examine, and telegraph to the defendants whether the bonds were genuine; and this, as a precaution of the defendants against risk. The latter clearly manifested an intention not to deliver the bonds unless they were genuine, or unless the plaintiffs would take them at their own risk. On any other terms the plaintiffs had no right to take them. Inquiry and notice to the defendants afterwards would have been idle, and would have been no precaution." The fact that we may think the loss should have fallen on the New York purchaser can be no reason, of course, for shifting the burden from the shoulders of the present plaintiffs to those of an equally innocent victim of this fraud. But, for the reasons stated, we are of opinion that plaintiffs purchased these bonds of defendants without

notice of their agency, looking to them as the principals, and that there was no agreement between the parties that they were taken without recourse.

The instructions given by the trial court at the instance of defendants cannot be reconciled with the views expressed in this opinion.

For the reasons given, we think that the judgment should be reversed and the cause remanded. Judge HAYDEN concurs ; Judge LEWIS did not sit.