**JULIUS KAYSER & CO., Plaintiff,**

v.

**TEXTRON INCORPORATED, Defendant.**

**Civ. A. No. 1600.**

United States District Court
W. D. South Carolina,
Anderson Division.

May 23, 1955.

Haynsworth, Perry, Bryant, Marion & Johnstone, Greenville, S. C., for plaintiff.

Watkins, Vandiver & Freeman, Anderson, S. C., for defendant.

WYCHE, Chief Judge.

This case, for alleged breach of contract, was tried by me without a jury at the November term of the court at Anderson, South Carolina, on oral testimony and written exhibits which were introduced by stipulation and without objection. Two depositions which had been taken in New York, one of Royal Little and W. D. Mewhort taken on motion of plaintiff, and the other of R. C. Kramer, taken on motion of defendant, were introduced, without objection.

The complaint is for the breach of an alleged contract between plaintiff and defendant which it alleges the defendant refused to perform to plaintiff's damage in the sum of $80,000.

The answer pleads, for a first defense, that there was no contract in that the parties never agreed on some of the terms of the alleged agreement and that

there was, therefore, no meeting of the minds of the parties on the agreement. It pleads, for a second defense, that the alleged contract was within the terms of the Statute of Frauds as incorporated in Section 11–101 of the Code of Laws of South Carolina, 1952, in that it is a contract or sale of lands or an interest in or concerning land and that there was no memorandum or note thereof in writing signed by the party sought to be charged therewith or some person thereunto lawfully authorized, and, therefore, no action can be maintained thereon.

The factual situation is involved and it will be helpful in stating the findings of fact to give here the following background of undisputed facts out of which the controversy arose. For convenience, the plaintiff will be hereafter sometimes called Kayser, and the defendant, Textron.

In the early part of 1952, Kayser had erected at Liberty, South Carolina, an industrial building designed to be used as a plant for dyeing and finishing full-fashioned hosiery. The cost of erecting the building was approximately $630,000. On July 25, 1952, Kayser conveyed this building to the Lincoln National Life Insurance Company for a consideration of $665,000, and simultaneously with the delivery of the deed, the insurance company leased the land and building to Kayser under a written contract of lease for an initial term of fifteen years, beginning August 1, 1952, with the option to the lessee of five additional five-year terms after the expiration of the initial term. The initial term of the lease ended the 31st day of July, 1967, and the annual rental for the fifteen-year term was $61,092.48. The rental for the extended terms, if the options therefor were exercised, was to be at a lesser rate. At the beginning of the term of the lease, Kayser installed a certain amount of machinery and equipment in the leased building and began partial operation of the finishing plant with a small force. Kayser shortly thereafter, for certain business reasons, decided to abandon the plant as a finishing plant, and although a certain amount of machinery was maintained therein, and some small operations of the machinery were carried on, at times, until the autumn of the year 1953, it was then completely closed down.

On July 8, 1953, R. C. Kramer, the Chairman of the Board of Kayser, and Royal Little, the Chairman of the Board of Textron, met in the office of Kramer in New York, to negotiate the terms of an agreement whereby Kayser would assign its lease of the building to Textron and Textron would assume the lease and the obligations thereunder to pay the annual rental to the lessor and also to pay insurance premiums and property taxes on the leased property.

The parties agreed on certain terms of the proposed contract and that a memorandum of these terms which Kramer had originally written down in pencil was to be sent to T. Frank Watkins of the law firm of Watkins & Watkins, in Anderson, South Carolina, as a basis for his preparing a written contract, setting out the obligations of the parties. This was done upon the assumption that Watkins was local counsel of both companies. Kramer learned a short while later that while Watkins represented Textron and another company in which Kramer was an officer, the firm of Haynsworth & Haynsworth of Greenville, South Carolina, was the attorney for Kayser in South Carolina. Whereupon, Kramer advised Watkins that Haynsworth & Haynsworth would represent Kayser's interest in preparing the contract and the two firms should collaborate.

In the negotiations on July 8, 1953, Little took the position that by assuming this lease, Textron would in reality be buying the plant since the total rent for the first fifteen-year term would amortize the cost of the building to the insurance company, with interest. He further contended that the building was more expensively built than Textron would have built it. Both of the negotiators knew that Textron proposed to use the building to house a tricot manufacturing plant. Little stated that the con-

tractor which had erected the building could and would build for Textron a satisfactory plant of the same size and capacity for $130,000 less than the building had cost Kayser because Textron did not need certain expensive features such as tiled walls, extravagant offices and excess water capacity which the building contained.

Little calculated that the plant he could have built would not cost more than $500,000 and that this cost with interest would be amortized by the payment of the annual rent of $61,092.48 for the portion of the term remaining after September 1, 1954. Upon Kramer calling to his attention that the rent was calculated on an interest rate of 4½ per cent, which was one-half of one per cent less than Textron could finance another building for, Little agreed that Textron would begin paying the rent five months earlier, i. e., on April 1, 1954, in view of this favorable interest rate. Kramer first proposed that rental payments start January 1, 1954, but they finally agreed on April 1, 1954, as the starting date for Textron to pay the rent. Little had stated that Textron could not begin operations in the building prior to April 1, 1954, since it would have to acquire machinery, and an estimated four-months time would be required to make the necessary changes in the electrical system and the air conditioning and to set up the tricot manufacturing machinery which he proposed to install in the building.

At this point in the negotiations, Kramer stated that it would not be fair to Kayser if Textron should begin the "use" of the building prior to April 1, 1954, and that if Textron's plans were changed so that it could begin the use of the building prior to April 1, Textron should pay the prorata rent from the time it began to use the building. Little testified that he agreed that if Textron should use the building for manufacturing operations prior to April 1, Textron would pay the rent from the beginning of such prior operations on a prorata basis.

Kramer's memorandum on this point provided that Textron would pay the rent accruing after April 1, 1954, and in case of "earlier occupancy", it should pay the rent from the date of such earlier occupancy. Little testified that in view of what they had both said, he understood the term earlier occupancy to mean earlier occupancy for operation of the plant and, as he understood the agreement, that Textron could enter the plant to prepare it for its new and changed use prior to April 1, without being liable to pay the prorata rent for this term of preparation for use. Kramer testified that, as he remembered the conversation, Little did not use the word "operations" and that it was his understanding that any entry into the building by Textron prior to April 1, 1954, to prepare it for use or for any other purpose would constitute "earlier occupancy" and render Textron liable for the full rent for such time as would be required for preparation.

Little was preparing to go to Europe shortly thereafter and notified Kramer that he was turning over to Mewhort, the Treasurer of Textron, the task of getting the agreement into shape. Mewhort proposed certain changes in the proposed agreement, which changes Kramer agreed to in part, and on July 21, mailed to Textron a memorandum revised in certain respects, which he submitted to Watkins and Haynsworth as a basis for drafting the contract which counsel were to prepare. This revised memorandum was essentially the same as that dated July 8, with respect to "earlier occupancy".

In August, 1953, while Little was abroad, Watkins wrote Mewhort, inquiring what was the agreement of the parties as to the meaning of "earlier occupancy" as contained in the memoranda. Mewhort replied that he understood that entry into the building to prepare it for use did not constitute "earlier occupancy", but that he would discuss this with Kramer and advise Watkins. He called Kramer on the telephone on Sep-

tember 3, and stated this understanding. Kramer told Mewhort emphatically that he was wrong and that in his view the agreement was that any entry into the building for any purpose other than looking around would be occupancy. Mewhort, on September 4, wrote Watkins of that conversation and "suggested" that in preparing the draft of the contract to be submitted to the two companies for their consideration he use Kramer's language (meaning the term "earlier occupancy") and not attempt to define its meaning. Watkins testified that he misunderstood Mewhort's suggestion to mean that he use Kramer's language to the effect that entry into the building for the purpose of making the changes and preparations for use would entail the payment of rent from the date of such entry.

The two firms of attorneys conferred in August, 1953, and both wrote letters to their respective clients inquiring as to the meaning which each party ascribed to the term "occupancy". To these inquiries Kramer replied for Kayser and Mewhort, in the absence of Little in Europe, replied for Textron. In September, Watkins submitted his draft of the proposed contract to Haynsworth and also to Mewhort asking the latter for his comments. Haynsworth revised this draft in certain particulars and submitted the revision to Watkins, who wrote Haynsworth that he was to attend a meeting of the Board of Directors of Textron on September 23, at which he would endeavor to secure the approval of this revised draft.

When Watkins submitted this draft to Mewhort and Little in New York on September 23, Little emphatically stated that the provisions of Paragraph 3 therein were not in accord with his agreement. The portion of Paragraph 3 which he objected to is as follows: "Entry by the assignee prior to April 1, 1954, for the purpose of alteration of the wiring, air-conditioning equipment or other facilities, or the buildings themselves, or for the purpose of storing and setting up machinery or other property on or in any part of the leased premises, shall be considered actual occupancy of the whole plant. Beginning with the date of such occupancy, the assignee shall pay the rent, insurance premiums, taxes and other charges and shall discharge all other obligations for which the Tenant is liable under the terms of the lease."

Little saw Kramer in his office on October 6, at which time they discussed this provision of the draft of the contract, but they reached no agreement and no contract was ever signed by them.

In compliance with Rule 52(a) of the Rules of Civil Procedure, 28 U.S.C.A., I find the facts specially and state my conclusions of law thereon, in the above cause, as follows:

### Findings of Fact

1. This Court has jurisdiction of the case by reason of diversity of citizenship of the parties and the amount in controversy.

2. The negotiations on the terms of the agreement which the parties sought to effect were had in New York on July 8, and October 6, 1953, between the Chairmen of the Boards of Directors of the two companies, viz., R. C. Kramer for the plaintiff Kayser, and Royal Little for the defendant Textron. Little, in preparing to go abroad, wrote Kramer on July 14, 1953, "I've asked Bill Mewhort, our Treasurer, to take over the Liberty transaction. He will be in touch with you and Frank Watkins to get things in shape." Mewhort did not conceive that he had authority to renegotiate items or terms which Little and Kramer had agreed on and he never attempted to do so. He conceived that his authority was limited to agreeing for Textron on other minor features of the contract and cooperating in having counsel prepare a contract embodying the agreement. No stenographic report of their conversation is available, and the testimony of the two reflects their memory of conversations occurring many months before they testified. However, there are little or no absolute contradictions in their respective versions.

3. Kramer made certain pencil notes of terms which he thought they had agreed on, and from these notes made out a memorandum of such points, which he mailed to Watkins through Little. This letter and a revision thereof dated July 21, 1953, stated, amongst other things, the following: "We (meaning Kayser) will make the payments on the lease up to and including March 31, 1954 * * * Textron is to have the right to earlier occupancy than April 1 by paying Kayser a pro rata part of the total annual rental and taxes for any month or fraction thereof."

4. There was a misunderstanding and mutual disagreement of the parties as to the meaning of the term "earlier occupancy" and on what was the import of this term, and no mutual assent to a material point being negotiated. Kramer believed that it meant that any entry upon the premises by Textron prior to April 1, 1954, for any purpose, other than looking around, would constitute earlier occupancy and impose on Textron an obligation to pay a pro rata part of the annual rent for the period following the date of such entry. Little, on the contrary, understood that it was the agreement that "earlier occupancy" meant occupancy by Textron prior to April 1, 1954, in the sense of conducting manufacturing operations in the premises and that Textron would be permitted an estimated period of four months prior to April 1, 1954, to enter upon the premises to prepare them to the point at which operations could begin, without Textron being liable for a pro rata part of the annual rent until April 1.

Little testified, and Kramer did not deny, that Kramer said, in effect: "If you *use* the building prior to April 1, you should pay rent"; and Little said: "Certainly, if we have *operations* going in the building prior to April 1, we will agree to pay the rent during the operations". He testified that he meant manufacturing operations, and he assumed that Kramer so understood him. Kramer testified that he said, in effect: "It would be unfair if Textron used that plant while we (Kayser) were paying rent therefor." When asked at the time of taking the deposition, "Didn't you make any reference to manufacturing operations?", the answer was, "I don't think so." When pressed with the question "But you might have?", he merely replied, "I don't know why I should have because Textron might have wanted to use the plant for any number of purposes." He admitted that he knew that the use of the plant for which Textron was acquiring it was for manufacturing tricot.

After leaving the conference of July 8, Little told Mewhort that, under the agreement on this point he had reached with Kramer, Textron was to be allowed to enter the plant prior to April 1, to prepare it for use without liability for rent. In July he also telephoned Watkins to the same effect. There was no reason for his doing this unless this was his understanding then. When, on September 23, he was shown a draft of the complete contract between the parties which provided for payment of rent for the period of preparation, he emphatically stated that that was not the agreement they had reached, and he sought out Kramer to clear this up with him.

The custom in leasing textile manufacturing plants and the experience of Textron in such matters was that the terms for which the rent was payable did not include time necessary to prepare the building for the new use, but rent was payable from the date when the premises could be prepared for manufacturing operations.

Little determined the date from which he was willing to begin the payment of rent by calculating what period of rent paying would amortize the cost to Textron to erect a new building of like capacity, plus interest. He testified this date was April 1, 1954; that he knew he could not begin operations prior to that date and readily agreed that if he did begin operations prior to that, he would pay the rent from his start of operations.

5. I find that the parties agreed to reduce their agreement to writing, which writing was to be prepared by their counsel and signed by the parties. The parties agreed that the memorandum of points set out in Kramer's letter of July 8, embodied the substance of their agreement on the points covered by it. However, there were other points to be agreed on to make out the contract. The letters and telephone conversations between Kramer and Mewhort in July, the telephone conversation between them on September 3, and the letters and the points covered by amendments proposed by the law firm of Parker, Chapin & Flatteau, of New York, also counsel for Kayser, on or about October 5, all show that the terms of the contract had not been all agreed on, even after the drafts prepared by Watkins and Haynsworth had been submitted to the principals. I find that the parties did not intend to be bound until the agreement was reduced to writing and signed, and that this was never done.

6. Having come to the conclusion that there was no meeting of the minds of the parties, and consequently no contract, it is not necessary for me to pass upon the defense of the Statute of Frauds.

### Conclusions of Law

1. The term occupancy is not a word of a recognized, certain and unvarying meaning, but it may have different meanings when applied to different types of buildings under different circumstances; 73 C.J.S., Property, § 14, p. 199, says it may differ very materially in its application to different kinds of property according to the use for which, from the nature of it, it is commonly designed.

The same principle is stated in Gordon v. Ross-Higgins Co., 9 Cir., 162 F. 637, 640. This was an action of ejectment, and the Court quotes with approval from an opinion of the Secretary of Interior as to the meaning of occupancy as follows: " 'The meaning of the term may differ very materially, it seems, in its application to different kinds of property, according to the use which, from the na-

ture of it, it is commonly designed. "Occupied" always implies a substantial and practical use of a building for the purpose for which it is designed.' "

In Continental Ins. Co. of New York City v. Kyle, 124 Ind. 132, 24 N.E. 727, 729, 9 L.R.A. 81, the Court said: "In construing a condition in an insurance policy against vacancy or non-occupancy, the courts will look to the subject-matter of the contract. * * * The occupancy of a dwelling, of a mill, of a barn, is each essentially different in its scope and character, and the construction must have reference thereto. * * *"

"To occupy mining property, and to enjoy the right of occupancy, under the statute, is to mine the same in a miner-like manner, and to extract ore from the same, mill it and dispose of it, and not merely to go upon it, yet refuse to dig and mine the ground." Butte & B. Consol. Mining Co. v. Montana Ore Purchasing Co., 24 Mont. 125, 60 P. 1039, 1043.

In Townsend v. Northwestern Insurance Co., 18 N.Y. 168, the Court, in considering a policy of fire insurance on a cotton factory, said: "Making necessary repairs about a building cannot be regarded as a way of occupying it. The phrase has a sense of continuousness, like the word 'keeping,' which is essential to its meaning."

■ The term occupancy is not defined in the memorandum letter relied on by the plaintiff to prove the agreement of the parties on the point as to when the building was to be considered as occupied for the purpose of initiating the liability to pay rent, and the testimony does not reveal that its meaning was clearly stated by either Kramer or Little. In determining what the parties meant when Kramer used the term and when Little did not object to its use in the memorandum, the Court must look to the testimony as to the nature of the property to which it referred, the circumstances surrounding the parties, and the preliminary negotiations. In Breedin v. Smith, 126 S.C. 346, 120 S.E. 64, 69, Justice Marion, speaking for the Supreme Court

of South Carolina, said: "But if it were doubtful whether the language of the contract, considered alone, would support the interpretation for which defendants contended, then it would be the duty of the court, in conformity to an established canon of construction, to inform itself of the circumstances which surrounded the parties at the time and to consider the preliminary negotiations leading to the execution of the contract, not for the purpose of allowing any variation or contradiction of its terms, but to the end that the language employed be so construed as to give it such effect, and none other, as the parties intended at the time the contract was made. 6 R.C.L., p. 849, § 239, page 839, § 228."

The same Court, in Holliday v. Pegram, 89 S.C. 73, at page 80, 71 S.E. 367, at page 370, quotes with approval the following: " 'Courts, in the construction of contracts, look to the language employed, the subject-matter, and the *surrounding circumstances*. They are never shut out from the same light, which the parties enjoyed, when the contract was executed, and, in that view, they are entitled to place themselves in the same situation as the parties who made the contract, so as to view the circumstances as they viewed them, and so to judge of the meaning of the words, and of the correct application of the language to the things described.' Nash v. Towne, 5 Wall. 689, 18 L.Ed. 527." (Emphasis added.)

Kramer meant one thing by occupancy, but Little, as a result of the conversation between him and Kramer, of his experience and knowledge of the custom in leasing manufacturing buildings, and the other surrounding circumstances, reasonably understood differently, and they never agreed on its meaning. In 12 Am. Jur., at page 518, this sort of a situation is discussed as follows: "When the offerer, using ambiguous language, reasonably means one thing and the offeree reasonably understands differently, there is no contract. It has been stated that the parties in such a case have 'said different things'. Thus, where, after the parties have apparently agreed to the terms of a contract, circumstances disclose a latent ambiguity in the meaning of an essential word by which one of the parties meant one thing and the other a different thing, the difference going to the essence of the supposed contract, the result is that there is no contract. Where there is such a misunderstanding as to the terms of a contract, neither party is obligated in law or equity. Furthermore, a defense may be asserted where there is a mutual mistake of the parties as to the subject matter, the price, or the terms, going to show the want of a consensus ad idem."

While Kramer insists that the meaning of the language of his memorandum letter was clear with respect to earlier occupancy, it is to be observed that his counsel thought otherwise. On August 10, 1953, they wrote to Mr. Kramer in part as follows: "Your letter appears to be very clear with the exception of what constitutes occupancy by Textron prior to April 1, 1954 pursuant to Paragraphs three and four of your letter. Mr. Watkins is writing Mr. Little to get his understanding of this question and requested that we write to you for your understanding of it. This matter can be covered very easily in the agreement, provided we know what the intention was."

"We would appreciate your giving us your thoughts on what constitutes prior occupancy within the terms of your agreement with Mr. Little, so that we may pass this information on to Mr. Watkins."

2. Having found that there was a misunderstanding between the parties as to the terms of the proposed contract, and no mutual agreement on a material matter to be covered by the contract, I hold that no contract was proved. As the Supreme Court said in National Bank v. Hall, 101 U.S. 43, 25 L.Ed. 822, "Where there is a misunderstanding as to the terms of a contract, neither party is liable in law or equity. * * * Where a contract is a unit, and left uncertain in

one particular, the whole will be regarded as only inchoate, because the parties have not been ad idem, and, therefore, neither is bound. * * * "

In Utley v. Donaldson, 94 U.S. 29, 24 L.Ed. 54, the Court said: "But conceding for the purposes of this opinion that the letter did contain such a proposition or annunciation as is insisted upon, then the inquiry arises whether it was so understood and agreed to by the plaintiffs.

"There can be no contract without the mutual assent of the parties. This is vital to its existence. There can be none where it is wanting. It is as indispensable to the modification of a contract already made as it was to making it originally. Where there is a misunderstanding as to any thing material, the requisite mutuality of assent as to such thing is wanting; consequently the supposed contract does not exist, and neither party is bound. In the view of the law in such case, there has been only a negotiation, resulting in a failure to agree. What has occurred is as if it were not, and the rights of the parties are to be determined accordingly."

3. I have found, as a matter of fact, that the parties fully understood and intended that their respective counsel were to prepare the final and complete contract, which was to embody all of the terms of agreement and that they did not intend to be bound until such a contract was prepared and executed. This being true, since the parties never did agree upon the draft of the proposed agreement prepared by counsel and did not sign it, they are not bound by the preliminary negotiations. In Holliday v. Pegram, 1910, 89 S.C. 73, 71 S.E. 367, 370, the Supreme Court of South Carolina, said:

" 'A valid contract may doubtless be made by correspondence, but care should always be taken not to construe as an agreement letters which the parties intended only as a preliminary negotiation. The question in such cases always is, Did they mean to contract by their correspondence, or were they only settling the terms of an agreement into which they proposed to enter after all its particulars were adjusted, which was then to be formally drawn up and by which alone they designed to be bound?' "

12 Am.Jur. at pages 523 and 524, discusses a situation like this as follows: "The mere fact that the parties have expressly stipulated that there shall afterwards be a formal agreement prepared, embodying the terms, which shall be signed by the parties, does not by itself show that they continue merely in negotiations. It is a matter to be taken into account in construing the evidence and determining whether the parties have really come to a final agreement or not. But as soon as the fact of the final mutual assent of the parties is established, so that those who draw up the formal agreement have not the power to vary the terms already settled, the contract is completed. The rule that mere reference to a future formal contract does not negative the existence of a present contract if the terms have been assented to has also been impliedly recognized in cases wherein offers and acceptances by letters and telegrams have been held to be enforceable contracts notwithstanding references to subsequent formal contracts. It has been said, however, that the fact that parties negotiating a contract contemplated that a formal agreement be prepared and signed is some evidence that they did not intend to bind themselves until the agreement was reduced to writing and signed. According to other cases, the circumstance that the parties intended a subsequent agreement to be made is strong evidence that they did not intend the previous negotiations to amount to an agreement.

"If the parties act under the preliminary agreement or receive benefits thereunder, they will be held to be bound notwithstanding a formal contract has never been executed."

In this case, Textron received no benefits under the preliminary agreement and did not act thereunder.

4. Having come to the conclusion that there was no meeting of the minds of the parties and consequently no contract, it is not necessary for me to pass upon the defense of the Statute of Frauds.

It is ordered, That judgment be entered for the defendant.