JULIUS KAYSER & CO., Appellant,

v.

TEXTRON, Incorporated, Appellee.

No. 7068.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 16, 1955.

Decided Jan. 5, 1956.

Alvin McKinley Sylvester, New York City, and Andrew B. Marion, Greenville, S. C. (S. M. Chapin, Parker, Chapin & Flattau, New York City, C. F. Haynsworth, Jr., Thomas K. Johnstone, Jr., and Haynsworth, Perry, Bryant, Marion & Johnstone, Greensboro, S. C., on brief), for appellant.

T. Frank Watkins and David L. Freeman, Anderson, S. C. (John V. Kean, Edwards & Angell, Providence, R. I., and Watkins, Vandiver & Freeman, Anderson, S. C., on brief), for appellee.

Before PARKER, Chief Judge, SOPER, Circuit Judge, and R. DORSEY WATKINS, District Judge.

R. DORSEY WATKINS, District Judge.

Julius Kayser & Co., (Kayser), a New York corporation, sued Textron, Incorporated (Textron), a New Jersey corporation, for damages for alleged breach of agreement by Textron to accept an assignment of a lease from Kayser. The District Court at Anderson, S. C., sitting without a jury, found that there was a misunderstanding and mutual disagreement of Kayser and Textron upon the terms of the alleged assignment, and that the parties did not intend to be bound by any agreement until it had been reduced to writing and signed. 132 F.Supp. 49. The Court therefore entered judgment against Kayser, finding it unnecessary to pass upon the additional defense of Textron that the South Carolina Statute of Frauds, (Code of Laws of South Carolina, 1952, Section 11–101) was applicable but that there had been no compliance with its provisions.

Kayser has appealed. In our opinion, there is substantial evidence to support the judgment of the District Court, which will be affirmed.

As one of the principal contentions of Textron, with which the District

Judge agreed, is that the language of the alleged agreement is susceptible of more than one interpretation and that the parties were in disagreement as to the proper interpretation, this court, may consider and construe the negotiations in the light of the situation and relation of the parties and the circumstances surrounding them, the nature of the subject matter, and the apparent purpose of the proposed agreement. City of Greenville v. Washington, American League, 205 S.C. 495, 32 S.E.2d 777; Breedin v. Smith, 126 S.C. 346, 120 S.E. 64; Holliday v. Pegram, 89 S.C. 73, 71 S.E. 367.

Since much of the evidence dealing with what the parties had in mind as to the terms of the proposed agreement likewise relate to, or bear upon, whether an agreement, if reached, was to become binding until reduced to writing and signed, no separate statement of facts on these two points will be made.

Kayser had about the middle of 1952 completed in Liberty, S. C., at a cost of approximately $630,000, a 50,000 square foot plant designed for finishing and dyeing women's full-fashioned hosiery. On or about July 25, 1952, Kayser sold the land and improvements to Lincoln National Life Insurance Company (Lincoln), an Indiana corporation, for $665,000. On the same day Lincoln leased the premises to Kayser for 15 years at a rental of approximately $61,000 a year, which would amortize Lincoln's purchase price, with interest at $4\frac{1}{2}\%$ per annum, over the original term of the lease. Kayser was given the option of five 5-year extensions at a rental of approximately $13,300 per year. The lease further provided that without written consent of Lincoln, Kayser or a subsidiary thereof might make alterations, additions, improvements, remove walls and extend the basement, but such rights expressly did not pass to an assignee. The lease otherwise permitted assignment by Kayser, such assignment not, however, releasing Kayser from liability for full performance of the lease.

Kayser installed some machinery and began some very small scale operations.

In December 1952, or early 1953, Kayser decided to abandon all operations at the Liberty plant, and this was done shortly thereafter.

Textron in 1952 had decided to move, over a two-year period, its operations, including tricot operations in Connecticut, to the South. By July 8, 1953, it had a building well under way at Williamston, S. C., to house its throwing machinery for twisting rayon yarn, and also its tricot operations. There developed a serious question whether adequate water was available for tricot dyeing, and a member of the Textron Board of Directors, whose engineering company had built the Kayser plant at Liberty, suggested that plant might be available. The situation was investigated through Alester Furman, a South Carolina broker, by Royal Little (Little), then Chairman of the Board of Textron. Little concluded that the building area was satisfactory but that the office was too elaborate; tiled walls had been installed unnecessarily, and the plant had twice the boiler capacity Textron would need.

On July 8, 1953, Little met with Raymond C. Kramer (Kramer), Chairman of Kayser's Board, in Kramer's office in New York. Little knew in general of the Kayser lease, but at that time had not seen it, and assumed it was on the basis of Kayser's cost, or $630,000. Little agreed that Textron could use the Liberty plant, but thought Kayser had paid too much for its construction. Little insisted Textron could build an adequate plant of the same size for $500,000 or $10 a square foot, and that he was in no hurry to install the tricot machinery On the theory that the plant had cost Kayser $630,000, Little insisted that any assignment not be effective until September 1, 1954, by which time Kayser would have paid enough rent to reduce the balance on the original lease to approximately $500,000. Kramer wanted the assignment effective January 1, 1954. When Kramer pointed out that the interest rate in effect incorporated in the lease was $4\frac{1}{2}\%$, Little agreed that this

was a lower rate than Textron would have to pay if it financed the construction of a new plant, and the parties compromised on April 1, 1954. Little also agreed that Textron would pay Furman a commission of $10,000.

The foregoing facts are either agreed upon or not in dispute.

Kramer testified that although Little was insistent that Textron would not "occupy" the plant until September, 1954, Kramer insisted that provision should be made with respect to "earlier occupancy" by which he meant occupancy for rewiring, installation of machinery, storage, office space or any purpose; and that it was agreed that Textron would pay rent, insurance and taxes on a pro rata basis for any time the plant was "occupied" prior to April 1, 1954. Little testified that it would require three to four months to reverse the lighting, change the dye house, rewire, and install machinery; that he knew Textron would not get "manufacturing" operations going before April 1, 1954, and he was willing to pay advance rent if Textron had "manufacturing operations going prior to that date." In response to questions designed to elicit the exact language used, Little said he believed Kramer used the word "use"; he did not think Kramer used the word "operations". Little used the word "operations", by which he meant "manufacturing operations."

Under date of July 8, 1953, Kramer sent to T. Frank Watkins of Anderson, S. C., a memorandum of purported agreement of Little and Kramer, under the impression Watkins would represent both parties. Included were the following provisions:

"2. Textron will assume all obligations under the lease beginning April 1, 1954.

"5. Textron is to have the right to earlier occupancy than April 1st by paying Kayser a pro rata part of the total annual lease and taxes for any month or fraction thereof."

Little, who was going to Europe, turned matters over to W. D. Mewhort, Textron's treasurer, and so advised Kramer on July 14, 1953.

On July 15, 1953, Mewhort wrote Kramer, suggesting certain changes, and embodied them in a redraft, dated July, 1953, of Kramer's draft of instructions to Watkins of July 8, 1953. Included was a renumbering of paragraph 5, quoted above, to paragraph 3, and provisions that Textron would pay rent to Kayser "in the amount of $10,000 covering the period through March 31, 1954"; that Kayser would transfer to Textron without cost all leasehold or building improvements on the plant premises, including lighting fixtures, power lines, plumbing work, etc.; and that Kayser would secure from Lincoln written consent to the assignment of the lease, together with specific agreement that Textron as assignee should have the same rights and privileges accorded Kayser under the lease.

Kramer rewrote the instructions to Watkins, under date of July 21, 1953[1], incorporating Mewhort's suggestions, but adding, after Mewhort's suggestion as to rent in the amount of $10,000 covering the period through March 31, 1954, the following: "except in case of earlier occupancy by Textron in which paragraph 3 above would become applicable without credit for the $10,000 referred to in this paragraph," which Kramer conceded was a "very distinct difference". Watkins was asked "to have the necessary papers to effect this transfer prepared and sent to Mr. Little and myself."

At a meeting of the Executive Committee of Textron's Board of Directors held July 30, 1953, consideration was given "to the proposal" that Textron take from Kayser an assignment of Kayser's lease "under which the Corporation [Textron] would not become liable for

[1.] As rewritten, they still contained the language "Mr. Royal Little of Textron came to an agreement this morning for Textron to assume the lease * * *."

rent until April 1, 1954." A resolution was adopted:

"That the Corporation enter into an assignment agreement with Julius Kayser under which the Corporation will acquire the rights of Julius Kayser & Co. as lessee * * * it being understood that the Corporation is not to assume rental obligations under the assignment until April 1, 1954, except for a $10,000 payment to Julius Kayser & Co."

On August 10, 1953, at a meeting of the Board of Directors of Kayser, the reference to this transaction is as follows:

"The Chairman reported on the negotiations being carried on with Textron Corporation for the taking over of the Liberty, South Carolina, plant, and on motion seconded and carried, authority was given to dispose of the lease to the Textron Corporation."[2]

On August 10, 1953, Watkins and Haynsworth & Haynsworth (the latter firm having been substituted for Watkins as counsel for Kayser), conferred to discuss the transfer. They were not certain whether the principals wished to have Lincoln a party, or at least indicate its assent. Nor did either of them know what the principals intended should constitute "occupancy". Watkins wrote to Mewhort on August 14, 1953 to inquire whether this meant when "manufacturing operations were started" or would storing or setting of machinery be considered occupancy.

On August 10, 1953, Haynsworth wrote to Kramer that his letter of July 21, 1953 to Watkins appeared "very clear with the exception of what constitutes occupancy by Textron prior to April 1, 1954. * * * This matter can be covered very easily in the agreement, provided we know what the intention was;" and asked for Kramer's "thoughts on what constitutes prior occupancy within the terms of your agreement with Mr. Little" so that this could be passed on to Watkins.

On August 14, 1953, Kramer replied to Haynsworth, without defining "occupancy". He further stated that the provision for $10,000 rent through March 31, 1953, was intended to reimburse Kayser for paying Furman's commission; and continued: "Incidentally, when you set up the agreement, have it stipulated that Textron pays us the $10,000 upon the signing of the agreement."

Haynsworth told Watkins that the reply received from Kramer did not answer Haynsworth's question as to what would constitute prior occupancy. Haynsworth suggested that occupancy should consist of "actually taking over the property * * * for whatever purpose."

On August 19, 1953, Mewhort advised Watkins that he had not specifically discused the definition of occupancy with Kramer. Mewhort thought Textron should have access to the premises "for the purpose of getting the premises in shape for operations subsequent to April 1. This would include the use of the premises for all purposes short of actual operations * * *." Apparently Mewhort thought the $10,000 "interim rental" really was rental through March 31, 1954.

Mewhort undertook to discuss the occupancy question with Kramer, and did so on or about September 1, 1953. He reported to Watkins that Kramer insisted that use of the premises in any manner—for example, for alteration of wiring, air conditioning, or storing or setting up machinery,—would constitute occupancy and require payment of rent. He suggested, therefore, "that the lease assignment be drafted using

---

2. That the reference to "negotiations" was advertently made is demonstrated by the fact that at the same meeting the Chairman "reported on the sale" of property in Chalfont, Pa., the resolution thereon being "that the acts of the officers of this Corporation, in entering into an agreement dated June 16, 1953, for the sale of the property * * * be and it hereby is ratified, confirmed and approved * * *."

Colonel *Kraemer's* language without attempting to define the term 'earlier occupancy'." Mewhort testified that the lawyers would prepare a draft that had to be approved by Textron and Kayser, and that he intended to have Watkins use the language of the July 21, 1953 draft, without defining "occupancy", and Little, who was soon returning, could "negotiate" with Kramer.

Watkins testified that he misunderstood Mewhort's suggestion, which he took to mean that in drafting the agreement he was to use Kramer's language that entry for any purpose other than "looking around" would require payment of rent. Watkins then prepared a "proposed draft of the assignment of lease" which he sent to Haynsworth for "examination and for any changes or additions you may suggest," with the statement that a copy was being sent to Textron "for criticism by it." This draft referred to "actual occupancy" and embodied Kramer's definition. It also provided that in addition to any other rental, Textron should pay Kayser $10,000 as "stand by rent", from the date of the assignment to the date of occupancy. Haynsworth rewrote the draft, making three changes. The only significant one was to the effect that Textron would not make any alterations, additions or improvements or other changes in the leased premises without Lincoln's written consent. Haynsworth did not, despite Kramer's instruction to him, provide for the payment by Textron of $10,000 upon the signing of the agreement. He did suggest that provision for Lincoln's consent and approval be added.

Watkins thought that Haynsworth's changes were proper; agreed that it would be well to have Lincoln's consent; suggested that Haynsworth draft such consent; and advised that Watkins would attend a Textron meeting on September 23, 1953, and would "endeavor to secure the approval of this draft at that time."

Watkins attended the Textron meeting, and at its conclusion presented the draft to Little, who had not previously seen it. Little at once vehemently objected to the provision for payment of rent before the beginning of manufacturing operations, stating that this was directly opposite to his understanding of the deal.

On October 5, 1953, Kayser's General Counsel discussed with Haynsworth, and Haynsworth with Watkins, four additions to the Haynsworth redraft. In view of the meeting of the principals on October 6, 1953, no action was taken on these suggestions.

On October 6, 1953, Little met with Kramer in the latter's office, and the question of "actual occupancy" was discussed. Each was adamant in his interpretation of the understandings reached at the July 8, 1953, conference. Various compromises were suggested, but none was acceptable. Both agreed that the conference ended with Kramer asking Little "When are you going to sign this lease?", and Little replying that he did not know.

In his letter of October 21, 1953, to Kramer, Little repeated his position, and stated that as there had been no "meeting of the minds" on the meaning of "occupancy", despite the further negotiations, Textron had decided to abandon the project. A recommendation to this effect was made to and approved by the Textron Board at a special meeting on October 26, 1953.

Kramer replied on October 28, 1953, stating that he thought a binding agreement had been reached, but offering, without prejudice, to submit the occupancy question to arbitration. Little replied on November 6, 1953, that he was not interested. Textron purchased the Robbins Mills at Robbins, North Carolina, in July 1954, where it conducts its tricot operation.

On March 23, 1954, Lincoln executed a written consent to the assignment of the lease by Kayser to Textron, and an extension to Textron, as assignee, of the same rights and privileges as those accorded under the lease to Kayser.

■ From the foregoing statement of facts, it is clear that Kayser and Tex-

tron had not, by October 21, 1953, when Little terminated negotiations, agreed upon the terms under which Textron might "occupy" the property prior to April 1, 1954, nor what was meant by "occupancy", "earlier occupancy" or "actual occupancy", and the District Court's finding to that effect was supported by substantial evidence. Kramer and Little, the real negotiators, had materially different ideas as to the meaning of occupancy. The attorneys for the parties would appear merely to have been draftsmen, with the right, as counsel for the parties, to raise objections and make suggestions. But even if (although we do not so find) the attorneys had a somewhat broader authority, they did not themselves know what was meant by occupancy, and specifically referred the question to their principals for determination.

 Under the circumstances, no binding contract had come into existence. The applicable rule has been authoritatively stated as follows:

"Though it is true that a party to a contract is bound by his express language, and can not contradict the meaning of his words by denying that he intended this meaning, he is not bound by the interpretation which may be placed on ambiguous language unless he was himself blameworthy in permitting the ambiguity, or even then if the other party to the transaction is equally blameworthy in not detecting the ambiguity. If every word and every act had but one permissible meaning, it would never be necessary in considering the formation of contracts to inquire into the intent of a speaker or actor; but since this is not the case, if an expression, in view of the circumstances under which it was used, may fairly mean either of two things, each party is at liberty to attach his own meaning, at least unless he was in some way responsible for the other party's mistake.

\* \* \* \* \* \*

"Such an error in language may relate to the object to which the apparent agreement relates, to the person with whom it was made, or to any of its terms." (Williston on Contracts, Revised edition, Volume One, Section 95).

"It may be supposed that A used the words in a sense different from that in which B understood them, but that A had no reason to suppose that his understanding would not also be B's, and B on his part had no reason to suppose that his understanding would not be A's. In such a case, the law recognizes in favor of each party the meaning he intended, therefore, no contract has been made \* '\* \*." Williston on Contracts, Revised edition, (Volume three, Section 605).

"Except as stated in §§ 55, 70, the undisclosed understanding of either party of the meaning of his own words and other acts, or of the meaning of the other party's words and other acts, is material in the formation of contracts in the following cases and in no others:

"(a) If the manifestations of intention of either party are uncertain or ambiguous, and he has no reason to know that they may bear a different meaning to the other party from that which he himself attaches to them, his manifestations are operative in the formation of a contract only in the event that the other party attaches to them the same meaning.

"(b) If both parties know or have reason to know that the manifestations of one of them are uncertain or ambiguous and the parties attach different meanings to the manifestations, this difference prevents the uncertain or ambiguous manifestations from being operative as an offer or an acceptance.

"(c) If either party knows that the other does not intend what his

words or other acts express, this knowledge prevents such words or other acts from being operative as an offer or an acceptance." (American Law Institute Restatement of Contracts, Section 71).

To the same effect is Holliday v. G. H. Pegram & Co., 1912, 94 S.C. 292, 77 S.E. 1014.

As the parties themselves in fact attached different meanings to the term occupancy, it is not here material to attempt to determine whether that term, apart from the background negotiations, would be susceptible of an exact definition, or if so, what that definition would be.[3]

■ Moreover, there had been no agreement on at least two other matters. One was as to the time when the payment of $10,000 was to be made. All drafts were silent, although Kramer had explicitly instructed his counsel to stipulate it should be paid upon the signing of the agreement. The other was whether, when and how, Lincoln would evidence its assent to Textron, as assignee, making any alterations, additions or improvements to the leased premises. Both Kramer and Little knew that the plant as built was not adapted to Textron's needs, and that substantial changes would be required. Lincoln's formal written consent was not obtained until March 23, 1954. These constitute additional grounds for holding that no binding contract had come into existence. See National Bank v. Hall, 1879, 101 U.S. 43, 25 L.Ed. 822; Utley v. Donaldson, 1876, 94 U.S. 29, 24 L.Ed. 54; S. H. Kress & Co. v. Fisher, 4 Cir., 1933, 65 F. 2d 682.

■ The District Court also found in effect that the parties did not intend to be bound until they had signed a written agreement. In our opinion, there is substantial evidence to support this finding and conclusion.

■ Whether or not the parties intend to be bound only by the execution of a formal written instrument is a question of intent. Holliday v. Pegram, 1911, 89 S.C. 73, 71 S.E. 367; S. H. Kress & Co. v. Fisher, 4 Cir., 1933, 65 F.2d 682. The inherent probability would certainly be that the parties would intend that a contract involving the payment of some $800,000 rent, plus taxes and insurance for 11 years, and which to be of utility to one of the parties required written consent of Lincoln to necessary physical changes, would be by a written agreement. The record so indicates. Memoranda were sent to counsel for drafting; all drafts by counsel provided for formal execution; the resolutions of the Textron Board specifically authorized entry by the corporation "into an assignment agreement" and the execution and delivery of the necessary instruments; Kramer instructed Haynsworth to have the agreement provide for the payment by Textron of $10,000 "upon the signing of the agreement"; and the last question asked by Kramer at the October 6, 1953 meeting was when Textron would sign the agreement. The whole tenor is that of negotiations which were no more than that until formalized and evidenced by a written agreement. The negotiations were terminated, not as a pretext to avoid the consequences of an unwritten but actual agreement, but because of lack of agreement upon a fundamental provision to be included in the contract if made, and while other matters were still open.

■ For the foregoing reasons the judgment below will be affirmed. In reaching our conclusions we have not relied upon evidence purporting to estab-

3. In support of the conclusion that the term "occupancy" was not one of certain and unvarying meaning, but may have different meanings under different circumstances, the District Judge cited Gordon v. Ross-Higgins Co., 9 Cir., 1908, 162 F. 637; Continental Ins. Co. of New York City v. Kyle, 124 Ind. 132, 24 N.E. 727, 9 L.R.A. 81; Townsend v. Northwestern Ins. Co., 18 N.Y. 168, and Butte & B. Consol. Mining Co. v. Montana Ore Purchasing Co., 24 Mont. 125, 60 P. 1039. See also State v. Canadian Pacific Railway Co., 1926, 125 Me. 350, 134 A. 59.

lish a "custom" that the undefined term "occupancy" in leases of textile plants meant occupancy for manufacturing operations, and not entry merely to prepare the property for such use. The evidence offered by Textron, relating to Textron's own experience, was not shown either to have been general in character, in New England or South Carolina, or of such uniformity and duration as to charge Kayser with knowledge. See Coates & Sons v. Early, 1896, 46 S.C. 220, 24 S.E. 305; Alexas v. Post & Flagg, 1924, 129 S.C. 53, 123 S.E. 769, 35 A.L.R. 969, and Martin v. Western Union Telegraph Co., 1907, 81 S.C. 432, 62 S.E. 833.

We have also considered other points urged by Kayser, but find them to be without merit.

Judgment affirmed.