# Smith *v.* Aikin *et al.*, Ex'rs.

### *Assumpsit.*

1. *Latent ambiguity in written contract; admissibility of parol proof in explanation of.*—By written contract, S. agreed to saw lumber for H. "at the price of two dollars per thousand feet," without indicating the rule or mode by which the lumber should be measured. At the time the contract was made, there existed two rules or modes of measurement, well known and understood by those engaged in the business of sawing lumber, and differing in results; one being to measure the logs before sawing them, and then, by calculation, to ascertain what quantity of lumber they would produce when sawed into inch boards; and the other, to estimate the lumber by actual measurement after sawing. *Held*, that the words, "at the price of two dollars per thousand feet," created a latent ambiguity in the contract, and that, in an action on the contract, parol evidence was admissible to show the rule or mode of measurement, in reference to which the parties contracted.

APPEAL from Etowah Circuit Court.

Tried before Hon. LeROY F. Box.

The facts are sufficiently stated in the opinion.

DENSON & DISQUE, for appellant. The court erred in allowing the parol evidence introduced against appellant's objection. *Sweeney v. Thomason*, 9 Lea, 359; *Willmering v. McGaughey*, 30 Iowa, 205; *Thorpe v. Sughi.* 33 Ala. 330; *Ins. Co. v. Wright*, 1 Wall. 456; *Stagg v. Ins. Co.*, 10 Wall. 589; *Bailey v. Railroad*, 17 Wall. 96; *Partridge v. Ins. Co.*, 15 Wall. 573; *Moran v. Prather*, 23 Wall. 493; *Davis v. Ball*, 6 Cush. 505. The words used in the contract are plain and unambiguous, and of well defined legal and popular meaning, and, therefore, they must be the sole expositor of the meaning and intention of the parties; and parol testimony is inadmissible to show the intent or meaning of the parties by the use of such words. *Willmering v. McGaughey, supra.*

J. B. MARTIN and DORTCH & DUNLAP, *contra.* The contract, when considered in connection with the evidence, presents a clear case of latent ambiguity. Extrinsic evidence is, therefore, admissible to show to which one of the two modes of measuring the lumber the parties intended to adopt.—*Doe, ex dem. Hughes v. Wilkinson*, 35 Ala. 462; *Gunn v. Clendenin,* 68 Ala. 294; *Chambers v. Ringstaff*, 69 Ala. 140; *Keller v. Webb*, 125 Mass. 88 (28 Am. Rep. 209); *Gray v. Harper*, 1

14

[Smith v. Aikin et al., Ex'rs.]

Story, 574; *Hart v. Hammett*, 18 Vt. (3 Wash.) 127; *Barrett v. Stow*, 15 Ill. 423; *Douley v. Tindall*, 5 Am. Rep. 240; *Stoops v. Smith*, 100 Mass. 63 (1 Am. Rep. 85).

STONE, J.—Hollingsworth agreed with Smith that the latter should saw lumber for him during the year 1878, "at the price of two dollars per thousand feet, to include thirty feet logs." Hollingsworth was to furnish the logs, and stack the lumber after it was sawed. Hollingsworth has died, and, the present suit is against his executors, to recover an alleged balance due on said contract. The contract was in writing, and we have copied above all it expresses in relation to the terms on which the sawing was to be done. Various accountings and settlements were had between the parties, growing out of said contract, during the time the work was being done, and shortly afterwards. All these were during the life of Hollingsworth.

For defendants, appellees in this court, it was contended there were two rules or modes of measurement, well known and understood by mill-men. One mode was to measure the logs before sawing them, and then, by calculation, ascertain what quantity of lumber they would produce, when sawed into inch boards. Sawing into boards necessarily implies the running of many seams through the log, and the cutting away in chips or saw-dust much of the substance of the log. Skilled mill-men estimated the waste at about one-fifth, when the timber is cut into inch boards. Measurement by this rule is called log-measure, because it is the method of ascertaining the capacity of the log, before it passes through the mill. According to this measurement, each inch board cut from the log would reduce it about $1\frac{1}{4}$ inches, the extra quarter inch being wasted in the sawdust. The other method was to estimate the lumber by actual measurement after sawing. It will be readily understood that, by this mode of measurement, the larger the pieces into which the lumber is sawed, the less the waste in sawing, and consequently the more the lumber produced from the log. And so, by this measurement, the less the labor bestowed, the greater the yield.

The real issue in this cause is, by what rule of measurement—whether by log or line measure—the account was to be stated. If by log-measure, then nothing was due plaintiff. If by actual measurement of the lumber after it was sawed, then there was something due him; for most of the lumber sawed was in large pieces. The testimony given tended strongly to show the account was agreed to be stated on the rule of log-measurement, and so the jury found.

It is contended for appellant that this contract is plain in itself, is worded in plain language which has a plain, unam-

biguous meaning in popular acceptation, and that it was the duty of the court to interpret it; and hence, it is claimed that the well settled principle of law, not to receive oral testimony to add to, vary, or contradict a written contract, applies to, and governs this case. And the plaintiff objected in the court below to all testimony that there were two scales for the measurement of lumber, and that the contract in this case was, that the measurement should be by the log-scale. It is replied to this that this was a contract between persons not dealing in the matter of buying and selling lumber, but engaged in the business of sawing logs into lumber, and having then so sawed; and that in that business, the rule of measurement by what is called the log-scale is well understood; that considering the undisputed fact that Hollingsworth was to furnish, and did furnish the logs, out of which the lumber was to be sawed, and was to be owner of the lumber when sawed, this was not a contract of sale, but a mere hiring of labor; and that the substance of the contract was, that Hollingsworth hired Smith to saw his logs into lumber. Hence, it is contended that the words "per thousand feet," found in the written contract, are shown by the facts and circumstances in this case to be ambiguous—a latent ambiguity, not appearing on the face of the instrument,—and such ambiguity, so made to appear, may be explained by oral proof.—1 Greenl. on Ev. § 278; *Gunn v. Clendenin*, 68 Ala. 294; *Chambers v. Ringstaff*, 68 Ala. 140.

In the case of *Drake v. Goree*, 22 Ala. 409, Justice Goldthwaite employed the following clear and forcible language: "The contract may relate to the time required for the making of an article, the process of which is known only to those actually engaged in its manufacture; to a thousand matters of art or skill, where truth is only to be attained through the medium of experts; and in cases of this character, is the court blindly to grope its way to conclusions, for no other reason than because the construction of a written instrument is involved, or to obtain through testimony that information upon which alone it can decide understandingly? Upon principle, as well as authority, we entertain no doubt that in all cases where a written contract, although complete in itself, contains a term which it is impossible for the court to construe, without the aid of evidence *aliunde*, it is proper to resort to such evidence for that purpose."

The case of the *Attorney General v. Shore*, frequently referred to as "Lady Hewley's Charities," 11 Sim. 592, republished, 34 Eng. Ch. Rep. 592, was first considered before Vice Chancellor Shadwell, afterwards before the Lord Chancellor, and last, the House of Lords. The latter tribunal took the opinion of the judges. The instruments to be construed con-

tained the language, "Godly preachers of Christ's Holy Gospel," and "Godly widows" of such preachers, as beneficiaries to take under them. The question was, who were "Godly preachers of Christ's Holy Gospel," as intended to be understood by the grantor. How was her intention to be ascertained? Baron Parke said : "There is no doubt that not only where the language of the instrument is such as the court does not understand, is it competent to receive evidence of the proper meaning of that language, as, when it is written in a foreign tongue, but it is also competent where technical words or peculiar terms, or, indeed, any expressions are used, which, at the time the instrument was written, had acquired any appropriate meaning, either generally, or by local usage, or amongst particular classes. This description of evidence is admissible in order to enable the court to understand the meaning of the words contained in the instrument itself." Lord Ch. J. Tindal said : "The general rule I take to be that, where the words of any written instrument are free from ambiguity in themselves, and where external circumstances do not create any doubt or difficulty as to the proper application of those words to claimants under the instrument, or the subject-matter to which the instrument relates, such instrument is always to be construed according to the strict, plain, common meaning of the words themselves ; and that, in such case, evidence *dehors* the instrument, for the purpose of explaining it according to the surmised or alleged intention of the parties to the instrument, is utterly inadmissible. . . . The true interpretation, however, of every instrument being manifestly that which will make the instrument speak the intention of the party at the time it was made, it has always been considered as an exception, or, perhaps, to speak more precisely, not so much an exception from, as a corollary to the general rule above stated, that, where any doubt arises upon the true sense and meaning of the words themselves, or any difficulty as to their application under the surrounding circumstances, the sense and meaning of the language may be investigated and ascertained by evidence *dehors* the instrument itself ; for both reason and common sense agree, that by no other means can the language of the instrument be made to speak the real mind of the party. Such investigation does, of necessity, take place in the interpretation of instruments, . . . . . in cases where terms of art or science occur ; in mercantile contracts, which, in many instances, use a peculiar language employed by those only who are conversant in trade and commerce ; and in other instances in which the words, besides their general, common meaning, have acquired, by custom or otherwise, a well known, peculiar, idiomatic meaning in the particular country in which

[McCorkle v. Rhea.]

the party using them was dwelling, or in the particular society of which he formed a member, and in which he passed his life."

The language of the contract we are considering is very brief, if not inaccurate and incomplete. "Smith agrees to saw lumber for Hollingsworth." Mills do not saw lumber. They saw logs into lumber. Mills do not grind meal. They grind grain into meal. Carpenters saw lumber; that is, they saw it into different shapes and sizes. Supplying, in this contract, the words which were necessarily understood, we have Smith's agreement with Hollingsworth to saw his, Hollingsworth's, logs into lumber for Hollingsworth, "at the price of two dollars per thousand feet." Is it two dollars per thousand feet of sawed lumber, or two dollars per thousand feet of logs sawed into lumber? According to the testimony, the language of this contract has two plain, well understood meanings, in the dialect of mill and lumber men, which brings it within the reason of the rule as to latent ambiguity. It falls also within Lord Ch. J. Tindal's rule, in which "words, besides their general, common meaning, have acquired, by custom, or otherwise, a well known, peculiar, idiomatic meaning," in the locality in which the parties reside, or in the trade or business in which they are engaged.

There is no error in the record.

Affirmed.