130 So.2d 380

**Jack FORD et ux.**

**v.**

**Prudie WARD.**

**8 Div. 966.**

Supreme Court of Alabama.

May 25, 1961.

Lusk & Lusk, Guntersville, for appellants.

Smith & Moore, Guntersville, for appellee.

COLEMAN, Justice.

This is an appeal from a decree establishing a disputed boundary line between two lots in Guntersville.

As we understand the record, a certain plat of a subdivision was filed for record in the office of the Judge of Probate on February 25, 1949. The plat purports to be a subdivision of a certain 40 acres, to wit:

" 'Nannie Smith's Extension of NE ¼ of NW¼ Sec. 13, T.' (sic), R 3E' "

The averments of the bill are to effect that the plat, as filed, showed the southeast corner of Lot 47 to be at a distance of 675 feet south of the northeast corner of the 40 acres, but that in the process of record-

ing, an error was made in copying the dimensions of one of the lots shown on the plat. As a result of the error, the record in the office of the Probate Judge showed the southeast corner of Lot 47 to be at a distance of 723 feet south of the northeast corner of the 40 acres, that is, 48 feet farther south than was shown on the plat which was filed for record.

It is further alleged that on July 8, 1957, the Probate Judge corrected the error appearing on the record of the plat, endorsed his action on the margin of the record, and also recorded the original plat by photostat. The allegations with respect to the error in recording are admitted by the answer of the respondent, Prudie Ward.

It appears that the complainants, Jack Ford and his wife, Bessie Ford, purchased their lot from one Sparks and his wife, and that complainants' lot lies south of but does not adjoin Lot 47. The bill alleges:

"THREE: That on June 25, 1955 complaints purchased and went into possession of a lot lying 52 feet South of said Lot 47, described as follows:

"Beginning at a point 52 feet South of the Southeast corner of Lot 47 in the Nannie Smith Extension of the Perry Smith Subdivision to the Town of Guntersville, Alabama, according to the Plat and Survey as the same appears on record in Plat Book 2 page 79 in the Probate Office of Marshall County, Alabama, at the southeast corner of the Prudie Ward Lot, thence South 94 feet 10 inches, thence West 105 feet, thence North 94 feet 10 inches, thence East 105 feet to the point of beginning, and being a part of Lot Number 56A in the Nannie Smith Extension of the Perry Smith Subdivision to the Town of Guntersville, Alabama, which said lot was conveyed in the deed of Nannie Smith to Bertha Sparks by deed recorded in Deed Book 221 page 129 in the Probate Office of Marshall County, Alabama.

said lot having been staked out substantially according to the erroneous recordation of said map, and they are still in possession of said lot."

As we understand the record, the Prudie Ward lot is 52 feet wide from north to south and lies between Lot 47 and the lot owned by complainants. The south boundary of the Prudie Ward lot is the north boundary of the lot of complainants and is the boundary line which is in dispute.

The complainants contend that the true location of the northeast corner of their lot is a point 52 feet south of the southeast corner of Lot 47 as Lot 47 appeared on the plat which was filed for record. Complainants contend that the north boundary of their lot is a line running west from their northeast corner, and that their northeast corner is a point 727 feet south of the northeast corner of the 40 acres.

The respondent, Prudie Ward, contends that complainants' northeast corner, which is also her southeast corner, is a point 775 feet south of the northeast corner of the 40 acres. Thus the point in dispute is the location of the northeast corner of complainants' lot.

The circuit court established the boundary line as contended for by the respondent, Prudie Ward, and complainants have appealed. The decree establishing the boundary is assigned as error.

The argument of complainants (appellants) is that the respondent, Prudie Ward, admitted all the allegations of the bill, except that the description contended for by appellants was the true description of their lot, and that respondent, Ward, set up as a special defense the assertion that complainants used the erroneous plat by way of reference with full understanding and knowledge. Complainants now insist that the respondent, Ward, failed to prove her "special defense," and that, as a consequence, she is not entitled to have the boundary established according to her contentions.

We agree that the evidence does not show that complainants had actual knowledge of the plat, erroneous or otherwise, at the time they purchased their lot, or that any plat was discussed when complainants negotiated with Sparks for the purchase. We are not persuaded, however, that failure to prove that complainants had actual knowledge of the contents of a plat, recorded or not, conclusively determines that the parties did not intend to incorporate the erroneous record of the plat in the deed. The burden remained on complainants to prove their assertion as to the true description of their lot, or at least that the true location of their north boundary is where they say it is.

We are of opinion that the testimony of the complainant, Jack Ford, concludes the matter against him. He testified that complainants purchased their lot June 6, 1955; that he, Ford, and his wife went to where the lot is, and Sparks came there and sat down on a big rock and they talked. Ford testified that no measurement was made, and also as follows:

"Q. Was anything pointed out as a corner? A. Nothing more than that south corner, that same corner between him and Terrell. Terrell has the lot just above him.

"Q. Terrell was renting from him? A. No, Sir.

"Q. He rented from Mrs. Prudie Ward? A. Yes.

"Q. And he ran it up there and said it was up there? A. Yes, Sir.

"Q. Was there any tree, bush or stump? A. I seen something, a tree.

"Q. Did he point that out? A. No, Sir.

"Q. Did anybody point that out? A. Mrs. Ina Terrell.

"Q. She pointed out this little pine tree? A. Yes, Sir.

"Q. Did Mrs. Prudie Ward say anything or had she said anything about Mrs. Ina Terrell being capable of speaking for her? A. She did when I talked to her.

"Q. Did you go talk to her about it? A. Yes.

"Q. And what did she say? A. She said that anything that Mrs. Ina Terrell said was allright with her.

"Q. And she said that pine tree, it went up to that pine tree? A. Yes, Sir. About six inches to that pine tree.";

and on cross-examination as follows:

"Q. Let me ask you this, Mr. Ford. What did you understand you were to get when you made the trade? A. 94 feet and 10 inches in the front running 105 feet this way.

"Q. Who told you that? A. Mr. Sparks.

"Q. 94 feet running from one corner— A. From the north corner to the south corner.

"Q. Did he point out to you where the north corner was? A. No, Sir.

"Q. Did he point out where the south corner was? A. Yes, Sir.

"Q. Is that the corner where you now today contend that it ought to be, where he showed you it was? A. Sir?

"Q. Is that corner now where you now contend it ought to be? A. No, Sir. Not where it is shown to be by the survey.

"Q. He showed you the wrong place? A. Yes, Sir. According to three surveyors.

"Q. But when you bought the land you understood that was the corner of your property? A. About the corner.

"Q. Is that right? A. He said, 'About the corner.'

"Q. You just understood that that was 'about the corner'? A. Yes, Sir.

"Q. And were you satisfied that was about the corner of your property? A. Why shouldn't I have been about that present time?

"Q. I am just asking you. A. He surveyed it up to where Terrell's lot is. I knowed nothing about that mistake."

Ford further testified that he started building a house on his lot in October or November, 1955, and was still satisfied at that time that the corner was where Sparks had pointed it out. Some time later, a survey was made of the land adjoining complainants' lot on the south, and the error in the record was discovered.

The other complainant, Mrs. Ford, testified that she intended to buy a lot "according to this description given in the deed," but she also said she did not see any map or plat and that "Mr. Sparks had the deed made." The following questions and answers, however, appear in her testimony:

"Q. And no measurements were made? A. No, Sir. We measured about where the corners were and he said, 'Well, I will get my tape at home and come up and measure it off', and he never did come up there and tape it off.

"Q. Until you discovered the mistake you were just taking someone else's word for it? A. Yes, Sir.

"Q. And when you found out the mistake you wanted to move your line according to the true plat? A. Yes, sure. I did not know anything else to do."

We understand that the quoted answer of Mrs. Ford refers to the occasion when the Fords were negotiating with Sparks on the ground, and that Sparks and the Fords

" * * * measured about where the corners were * * *."

Sparks testified that he sold first to Prudie Ward and then to Jack Ford "over a year from the time I sold to Prudie Ward." Sparks testified that when he sold to Prudie Ward, he " * * * showed her where the corner come to and I showed that and measured it." Sparks denied that he had shown the Fords where the corner would be and said he had never told them anything. He further testified, however, that he told him (Jack Ford, we understand), that he, Sparks, had "96 feet" to start with and " * * * went out and showed him (Ford) where I thought it (referring, we understand, to the Ford lot or a corner thereof) would be." Sparks also said he told Ford, "I told him it would be up to that hedge, that corner."

No deed to any property appears in the record. Complainants aver that on June 25, 1955, they purchased a lot of a certain description. We assume that the description of the purchased lot as averred in the bill is the description contained in the deed from Sparks to complainants, and that the date of the deed is June 25, 1955. Without that assumption, complainants' title and ownership cannot be understood at all. The description designates the point of beginning as 52 feet south of the Southeast corner of Lot 47 "according to the Plat and Survey as the same appears on record in Plat Book 2 page 79." In June, 1955, there was only one record of the plat in the office of the Probate Judge in Plat Book 2 at page 79, and that was the erroneous record.

■ Where a map is referred to in a deed as indicating what is intended to be conveyed, the map is regarded as part of the conveyance and may be referred to for the purpose of aiding in the identification of land. Doe ex dem. Miller v. Cullum, 4 Ala. 576. Lines and figures on a plat become part of the description by reference as if the courses and distances shown

thereby were set out in the deed. Smith v. Harbaugh, 216 Ala. 202, 112 So. 914.

Since there was only one plat of the designated subdivision on record at the time the deed to complainants was executed, it is reasonable to assume that the parties knew only of that plat and made the deed with reference to it. Lester v. Schutt, 128 Fla. 302, 174 So. 583. It is certain that the grantees, the complainants, had reference to no other plat. They both testified that they did not know of any plat, and there is no testimony, other than the alleged description of their lot, tending to show that they had knowledge of any plat.

There is no testimony that Sparks had actual knowledge of any plat at the time he sold to either Prudie Ward or the Fords. Sparks testified:

"Q. Didn't you say a few minutes ago you pointed out where you thought the corner was to the Fords? A. Yes.

"Q. I want to know what you told him you thought the corner was? A. I told him it would be up to that hedge, that corner.
"Q. All right. Now, then, where is that spot with reference to the hedge that exists now, between those two? A. That hedge is fifty-two feet from the corner of that, that's what I was talking about.

"Q. And that's what you told Mr. Ford now? A. Yes, that's right.

"Q. At the time he bought the property? A. Yes. That corner had been moved.

"Q. It was his understanding it would be there at the time he bought the property? A. Yes."

The description of the lot allegedly purchased by complainants refers to a plat and makes the plat a part of the description. Moreover, the bill avers: " * * * said

lot having been staked out substantially according to the erroneous recordation of said map, and they are still in possession of said lot."

We are of opinion that the record in the office of the Probate Judge, which was erroneous, must be regarded as the plat referred to in the description. There was no other recorded plat on June 25, 1955. When the erroneous plat is considered as a part of the description, the description is clear and unambiguous on its face. In view of the error shown, however, we are of opinion that such description must be regarded as containing a latent ambiguity. The ambiguity became apparent when the surveyors undertook to locate on the ground the points shown on the erroneous record of the plat. The error in distance which appeared in the record of the plat created uncertainty as to the location of the lot described.

A latent ambiguity arises when the writing on its face appears clear and unambiguous, but there is some collateral matter which makes the meaning uncertain; and parol or other extrinsic evidence is admissible to explain or clarify a latent ambiguity. Gibson v. Anderson, 265 Ala. 553, 92 So.2d 692; Chambers v. Ringstaff, 69 Ala. 140.

Looking to the evidence as to what was said and done by complainants and their grantor, Sparks, at the time complainants negotiated for the purchase of their lot, we are of opinion that the evidence shows that complainants intended to purchase, and Sparks intended to sell, a lot adjoining and lying south of the Prudie Ward lot; that Sparks pointed out to complainants the approximate location of a corner of the lot he intended to sell; that the corner so pointed out was a corner of the Prudie Ward lot, which lot Sparks had previously measured off when he sold to Prudie Ward; and that the corner pointed out to complainants was a corner established according to the erroneous plat which then appeared on record.

The intent of the grantor manifested by the words used in the grant, construed in the light of attendant facts and circumstances, is the controlling factor in determining the intent of the parties in respect to the land thereby conveyed. Spires v. Nix, 256 Ala. 642, 646, 57 So.2d 89. We are of opinion that, according to the evidence, the intent of the parties was to place the northeast corner of complainants' lot at a point 775 feet south of the northeast corner of the 40 acres "according to the erroneous recordation," and to make the boundary line between the lot of complainants and the lot of respondent, Prudie Ward, a line running west from such northeast corner of complainants' lot.

Appellants insist that the description must be considered as making reference to the plat as actually made and filed, and not as making reference to the erroneous record. To support this insistence, appellants rely on Chapman & Co. v. Johnson, 142 Ala. 633, 38 So. 797, and similar cases which hold that under § 98, Title 47, Code 1940, a conveyance is operative as a record from the time of its delivery to the Probate Judge, and no subsequent mistake of his could deprive it of the operation thus given to it by law. The instant case is not affected by that rule. It is not shown that any party to this suit intended to refer to or rely on the actual plat instead of the erroneous record. On the contrary, the description itself, the averments of paragraph THREE of the bill of complaint which are above set out, and the attendant facts shown by the evidence persuade us that the parties intended to refer to the erroneous plat. This decision undertakes to give effect to the intention of the parties.

The decree appealed from determined the boundary in accord with the views herein expressed and is due to be and is affirmed.

Affirmed.

LIVINGSTON, C. J., and SIMPSON and GOODWYN, JJ., concur.