[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 386 
Ed F. Meyer ("the husband") and Cathy W. Meyer ("the wife") were divorced on September 29, 1999. Based upon an agreement of the parties, the trial court entered a judgment that, among other things, provided for a division of the husband's military retirement benefits. Paragraph 5 of the divorce judgment states:
 "The [wife] is awarded all benefits to which she may on the date of this decree be mandatorily entitled under the Uniformed Services Former Spouses' Protection Act ('USFSPA'), which shall be determined based upon the duration of the marriage."
The Uniformed Services Former Spouses' Protection Act ("the USFSPA"), 10 U.S.C. § 1408, "`is basically concerned with the garnishment of military retirement pay.'" Ex parteSmallwood, 811 So.2d 537, 540 (Ala. 2001) (quotingBeesley v. Beesley, 114 Idaho 536, 540, 758 P.2d 695, 698
(1988)). Section 1408(d)(1) of the USFSPA provides that, upon receipt of a "court order," the secretary of the applicable branch of the armed services will make direct payments from a service member's disposable retired pay to the service member's former spouse. "Court order" is defined in10 U.S.C. § 1408(a)(2). Section 1408(a)(2)(C) provides, in pertinent part:
 "(2) The term `court order' means a final decree of divorce . . . issued by a court, or a court ordered, ratified, or approved property settlement incident to such a decree . . ., which
 ". . . .
 "(C) in the case of a division of property, specifically provides for the payment of an amount, expressed in dollars or as a percentage of disposable retired pay, from the disposable retired pay of a member to the spouse or former spouse of that member."
In order to be entitled to direct payments by the secretary, the former spouse must have been married to the service member for 10 or more years during which the member performed at least 10 years of creditable service.10 U.S.C. § 1408(d)(2). Courts in the majority of states have held that the 10-year requirement does not preclude the division of military retirement benefits for couples who have been married less than 10 years; rather, they have held that it merely precludes direct payments by the secretary to the former spouse. See Ex parte Smallwood, 811 So.2d at 541.
The USFSPA limits to 50 percent the amount of a service member's disposable retired pay that is directly payable by the secretary to a former spouse pursuant to a court order.See 10 U.S.C. § 1408(e)(4)(B). A court is not limited, however, to awarding the former spouse *Page 387 
only 50 percent of a service member's disposable retired pay. The USFSPA merely
 "`limits direct government payments to former spouses to 50 percent of disposable retired pay. . . . That means that a state court wishing to award a former spouse more than 50 percent of disposable retired pay must order direct government payments and payments by the member of the military to the spouse.'"
Ex parte Smallwood, 811 So.2d at 540 (quotingDeliduka v. Deliduka, 347 N.W.2d 52, 55
(Minn.Ct.App. 1984)).
A state court is not required to award a former spouse any portion of a service member's military retirement pay. See J.N.H. v. N.T.H., 705 So.2d 448, 451
(Ala.Civ.App. 1997) (stating that "Military retirement benefits are subject to the same rule of equitable division within the trial court's discretion as is other marital property. So long as the trial court's division of property is equitable, it is not required to divide military retirement benefits.").See generally Michael A. Kirtland, Divorce andTaxes: What Every Divorce Attorney Should Know About Taxes, 61 Ala. Law. 116 (March 2000):
 "The issue of military retirement benefits in a divorce is one filled with misinformation, both among divorcing parties and among lawyers practicing divorce law. Perhaps the most common misperception is that a person divorcing a military member is automatically entitled to a portion of the military member's retirement benefits as a matter of federal law. Quite to the contrary, military retirement benefits are never an automatic entitlement. There are provisions in the law which permit the Department of Defense to make direct payment of retirement benefits to the former spouse at the time the retired military member begins to collect military retirement, depending on a combination of the length of the marriage and the length of military service."
Kirtland, 61 Ala. Law. at 118 (emphasis added).
In August 2001, the wife, who had apparently been informed that she would not be able to obtain a garnishment of the husband's retirement income from the Secretary of the Air Force because the divorce judgment did not award her either a specific dollar amount or a specific percentage of the husband's disposable retired pay, filed a "Petition to Clarify" the divorce judgment. The wife alleged that, having been married to the husband for more than 10 years, she was "entitled to a certain percentage of [the husband's] disposable net military retirement pay." She specifically requested that the trial court clarify paragraph 5 of the divorce judgment and determine the percentage of the husband's military retirement pay to which she was entitled under the USFSPA.
At hearings before Circuit Judge Gary L. McAliley on November 28, 2001, and May 30, 2002, the parties appeared with counsel and presented evidence and oral argument with respect to the wife's petition. The parties introduced a transcript of the following discussion that took place in open court on August 20, 1999, when their lawyers outlined for Judge McAliley the terms of the proposed settlement agreement.
 "MR. MOTLEY [the husband's attorney]: Judge, because my client is in the military, there are certain retirement benefits that are available to his wife. And I will check and make sure that we do everything to make sure that all retirement benefits available to her under the current Department of Defense regulations are to be awarded to her, and I will provide that. *Page 388 
 "THE COURT: How long has the marriage overlapped military service, for the record?
 "MR. MOTLEY: All of the 13 years.
 "THE COURT: Thirteen?
 "MR. MOTLEY: Yes, sir. And I think anything over 10 allows her some part of the retirement.
 "THE COURT: Right.
 "MR. MOTLEY: And we will do that."
The parties and their lawyers testified that, at the end of the foregoing discussion, Judge McAliley instructed the lawyers to find out the percentage of the husband's military retirement pay that the wife was entitled to receive and to draft a proposed order for him to sign. Debbie Jared, the wife's lawyer, testified that she understood that Thomas D. Motley, the husband's lawyer, had agreed to "find out" what the percentage was and to send her a copy of the proposed order before submitting it to the judge. Kimberly Clark, an associate in Motley's firm, testified that Motley gave her his notes from the August 20, 1999, hearing and asked her to draft the proposed order. Ms. Clark then sent Ms. Jared the following draft of what was to become part of paragraph 5 of the divorce judgment:
 "The [wife] is awarded all benefits to which she may on the date of this decree be mandatorily entitled under the Uniformed Services Former Spouses' Protection Act ('USFSPA')."
Ms. Jared requested and Ms. Clark approved the addition of the phrase "which shall be determined based upon the duration of the marriage." Paragraph 5 was then submitted to and signed by Judge McAliley in its current form:
 "The [wife] is awarded all benefits to which she may on the date of this decree be mandatorily entitled under the Uniformed Services Former Spouses' Protection Act ('USFSPA'), which shall be determined based upon the duration of the marriage."
The husband testified that, during the initial settlement negotiations, he did not voluntarily agree to divide any portion of his military retirement benefits with the wife. Then, he said, either the wife or her attorney stated that the amount of military retirement benefits the wife would receive "was set by law, there was nothing to argue about, and [he] couldn't do anything about it." The husband testified that he replied, "Okay, if that's the law, I can't fight the law," and he agreed to give the wife whatever "was mandated by the military." The husband said that he left the courthouse on August 20, 1999, thinking that "the government was going to make [him] pay a certain percentage of [his] retirement to [the] wife." Later, however, he went to the legal office at Fort Rucker and learned that the wife was "mandatorily entitled to no percentage."
At a hearing on the wife's "Petition to Clarify," Mr. Motley, the husband's lawyer, stated to the court that he was not requesting that the agreement be set aside, but that it be enforced as written. He continued:
 "At the time I left the courthouse, I was under the impression that . . . Major Meyer . . . was going to be mandated by the military, because of the length of his marriage, into paying a certain portion each and every month of his retirement pay to his ex-wife, after his retirement. I was under that understanding.
 "Major Meyer was under that understanding. And I think if you will read what I said [at the hearing on August 20, 1999], I pretty much told you that in court, that that was the understanding.
 "The problem is, Judge, . . . the only thing that we agreed to was that that *Page 389 
was mandated. [Major] Meyer never agreed to any percentage. . . .
 ". . . [The wife's] understanding was exactly the same. All of us thought the exact same thing when we walked out of here [on August 20, 1999], that any award that was to be done was to be done by the military based on the length of the marriage. And that is exactly what we agreed to."
The wife testified that, during the settlement negotiations, she believed that she was entitled to a certain percentage of the husband's military retirement pay based on a formula using the number of years the parties were married, but she did not know what that percentage was. She stated that she relied on Mr. Motley, the husband's lawyer, who "told [her] that he had handled these cases before, that he knew what paperwork needed to be filled out, and that he would get it filled out." The wife turned to Ms. Jared, her lawyer, and asked, "What do you think?" According to the wife, Ms. Jared replied, "I don't know anything about it. If he knows what he's doing, let's let him take care of it, if he will."
Ms. Jared informed the court that the wife was not asking the court to set aside the agreement, but to clarify it. She testified that after the parties had outlined the terms of the proposed settlement agreement to Judge McAliley on August 20, 1999, she believed that the parties had agreed that the wife was entitled to a percentage of the husband's military retirement pay based on the number of years they were married; that no one knew what the percentage was; and that the husband or his lawyer would find out the correct percentage and draft the order for the judge. Ms. Jared acknowledged that "the fly in the ointment" was the use of the word "mandatorily" in paragraph 5, but, she said, when she reviewed the proposed order Ms. Clark sent her, she did not realize the significance of the word.
On December 22, 2002, Judge McAliley resigned from the bench; on December 23, 2002, he was appointed as the District Attorney for the Twelfth Judicial Court. On June 23, 2003, he purported to enter an amended judgment clarifying paragraph 5 of the divorce judgment to award the wife one-third of the husband's military retirement benefits. The husband then filed a petition for a writ of prohibition with this court, seeking to vacate the order purporting to amend the divorce judgment. This court issued the writ, and, on July 28, 2003, Circuit Judge Steven E. Blair vacated former Judge McAliley's order.
On September 28, 2004, Judge Blair conducted a hearing on the wife's petition to clarify, at which Ms. Jared and Ms. Clark were the only witnesses to testify. Their testimony was substantially the same as that given before Judge McAliley in earlier hearings. There was no testimony from Mr. Motley, who had died, from the wife, or from the husband. When the husband's lawyer moved to include in the record the husband's testimony from the earlier hearings before Judge McAliley, Judge Blair denied the motion, stating that he would not consider the husband's testimony from earlier hearings. He explained:
 "I thought since the Court of Civil Appeals ordered me to set aside [Judge McAliley's] order and hold it for naught, I thought we were starting from square one.
 ". . . .
 "That prior matter was set aside, . . . all of that testimony and evidence was set aside.[1] I went forward on what we had today." *Page 390 
Judge Blair indicated, however, that he had reviewed the transcript of "the agreement that was read into the record [on August 20, 1999]." He then stated:
 "I'm familiar with the habit, custom and routine of the attorneys, at least in this circuit, about what was intended when we discussed military retirement benefits.
 "I have absolutely no doubt that the intent of the parties, and certainly Mr. Motley, who I knew very well, was to effect a division of the military retirement benefits.
 ". . . .
 "But the Court [finds], based upon what I've read that Mr. Motley said in the record, and what I know to be the habits and customs and routines of the attorneys before this bench, [that] there [was] an effectuated division of the military retirement, and I certainly will reform the decree of divorce, to reflect that."
On September 30, 2004, Judge Blair ordered that paragraph 5 be "reformed to reflect the intent of the parties" to award the wife 32 percent of the husband's military retirement pay, and he entered an order amending the divorce judgment accordingly.
The husband appeals, contending that Judge Blair erroneously modified the judgment of divorce more than 30 days after its entry. The husband maintains that paragraph 5 of the divorce judgment is clear and unambiguous and reflects an intent to have the court award the wife that part of his military retirement benefits that was mandated by federal law, which, he later learned, was zero. The wife, on the other hand, contends that the paragraph 5 is ambiguous and that the trial court's order reforming the provision was necessary in order to effectuate the intent of the parties.
It is clear to this court that the parties and their lawyers were operating under the mistaken impression that, because the parties had been married for more than 10 years, the wife was automatically, or "mandatorily," entitled to a portion of the husband's military retirement benefits. Although a mutual mistake of fact or law[2] could authorize reformation[3] or rescission[4] of paragraph 5, neither party argues *Page 391 
that paragraph 5 was the product of a mutual mistake, or that paragraph 5 should, by reason of a mutual mistake, be reformed or rescinded. The husband argues that the provision is not ambiguous and, accordingly, that it should not have been reformed by the trial court at all, but that it should have been enforced according to its clear language. The husband contends that the wife should take no share of his military retirement pay because the parties' agreement awards the wife only the share that the USFSPA mandates as a consequence of the duration of the marriage and, he points out, the USFSPA does not mandate any share for a spouse. The wife argues that paragraph 5 should be reformed, or "clarified," solely because it is ambiguous and does not clearly express the intent of the parties.
Because we review de novo a trial court's determination that a contract is ambiguous, Winkleblack v. Murphy,811 So.2d 521 (Ala. 2001), we must determine whether the trial court was correct as a matter of law in deciding that paragraph 5 was ambiguous.
 "`The courts of this state favor compromise and settlement of litigation, particularly in cases involving families. "[A] settlement agreement which is incorporated into a divorce decree is in the nature of a contract." A divorce judgment should be interpreted or construed as other written instruments are interpreted or construed. "The words of the agreement are to be given their ordinary meaning, and the intentions of the parties are to be derived from them." Whether an agreement is ambiguous is a question of law for the trial court. An agreement that by its terms is plain and free from ambiguity must be enforced as written. An ambiguity exists if the agreement is susceptible to more than one meaning. However, if only one reasonable meaning clearly emerges, then the agreement is unambiguous.'
 "R.G. v. G.G., 771 So.2d 490, 494
(Ala.Civ.App. 2000). `Where an ambiguity exists, parol evidence may be admitted to clarify or explain the ambiguity.' Curry v. Curry, 716 So.2d 707, 709 (Ala.Civ.App. 1998)."
Van Allen v. Van Allen, 812 So.2d 1276, 1277
(Ala.Civ.App. 2001). See also Ex parte Littlepage,796 So.2d 298, 301 (Ala. 2001); and Jardine v. Jardine,918 So.2d 127, 131 (Ala.Civ.App. 2005). Generally, Alabama courts "`will not look beyond the four corners of an instrument unless the instrument contains latent ambiguities.Martin v. First Nat'l Bank of Mobile, 412 So.2d 250,253 (Ala. 1982).'" Kershaw v. Kershaw, 848 So.2d 942,955 (Ala. 2002) (quoting Ex parte Employees Retirement Sys.Bd. of Control, 767 So.2d 331, 335 (Ala. 2000)).
There are generally two kinds of ambiguity that may arise in a contract: patent and latent. See 11 Richard A. Lord,Williston on Contracts § 33:40 at 816 (4th ed.2003). A patent ambiguity is one that is apparent upon the face of the instrument, arising by reason of inconsistency or uncertainty in the language employed. See McCollum v.Atkins, 912 So.2d 1146, 1148 (Ala.Civ.App. 2005) (quotingRaceway v. Brittain, 360 So.2d 306, 308 (Ala. 1978)) (stating that `"[a] patent ambiguity is not a true ambiguity; it is merely confusion created on the face of the [instrument] by the use of defective, obscure or insensible language'"). *Page 392 
On the other hand, a latent ambiguity is one that "appear[s] only as the result of extrinsic or collateral evidence showing that a word, thought to have but one meaning, actually has two or more meanings." 11 Williston on Contracts § 33:40 at 816. See Julius Kayser Co. v. Textron,Inc., 132 F.Supp. 49, 55 (W.D.S.C. 1955), aff'd,228 F.2d 783 (4th Cir.1956) (stating that there is a latent ambiguity when circumstances disclose that the contract contains an "essential word by which one of the parties meant one thing and the other a different thing"); and Medical Clinic Bd. ofBirmingham-Crestwood v. Smelley, 408 So.2d 1203, 1206
(Ala. 1981) (quoting Ford v. Ward, 272 Ala. 235, 240,130 So.2d 380, 384 (1961)) (stating that a latent ambiguity may exist in what otherwise appears to be a clear and unambiguous writing if "`there is some collateral matter which makes the meaning uncertain; and parol or other extrinsic evidence is admissible to explain or clarify a latent ambiguity'").
 "The classic example of a latent ambiguity is found in the traditional first-year law school case of Raffles v. Wichelhaus, 2 Hurl C. 906; 159 Eng. Rep. 375 (1864). In Raffles, two parties contracted for a shipment of cotton `to arrive ex Peerless' from Bombay. However, as it turned out, there were two ships sailing from Bombay under the name `Peerless.' Thus, even though the contract was unambiguous on its face, there was a latent
ambiguity regarding the ship to which the contract referred."
City of Grosse Pointe Park v. Michigan Mun. Liab. Prop. Pool, 473 Mich. 188, 217 n. 21, 702 N.W.2d 106, 123
n. 21 (2005). See also Smith v. Aikin, 75 Ala. 209, 210
(1883) (holding that a contract calling for one party to saw lumber for the other party "`at the price of two dollars per thousand feet'" contained a latent ambiguity because there were two modes of measurement in the milling trade — log measurement and line measurement — and it was uncertain by which mode the term "per thousand feet" was to be calculated).
There was neither a patent nor a latent ambiguity in the language of paragraph 5. The provision was free of patent ambiguity because the language employed was clear and easily comprehensible; no "confusion [was] created on the face of the [document] by the use of defective, obscure or insensible language." Jacoway v. Brittain, 360 So.2d at 308. The provision was free of latent ambiguity because, as the undisputed evidence demonstrated, there was no "uncertain meaning" as to any term in paragraph 5. On the contrary, the parties and their lawyers had the same understanding with respect to the division of the husband's military retirement pay; all believed that the USFSPA mandated that the wife receive a certain percentage, even though they were unaware of what that supposed percentage was.
We hold that the trial court erred by reforming paragraph 5 of the parties' divorce judgment on the basis of ambiguity — the only basis raised at trial or argued on appeal. Paragraph 5 is not ambiguous.
The judgment of the Coffee Circuit Court is reversed, and the cause is remanded with instructions to vacate the order clarifying and reforming paragraph 5 of the parties' divorce judgment.
REVERSED AND REMANDED WITH INSTRUCTIONS.
PITTMAN and BRYAN, JJ., concur.
MURDOCK, J., concurs in the result, without writing.
THOMPSON, J., dissents, without writing.
[1] The transcripts of the earlier hearings are in the record on appeal.
[2] See 27 Richard A. Lord, Williston onContracts § 70:106 at 533 (4th ed.2003) (stating that "[i]t used to be the rule that a contract could not be rescinded for a mutual mistake if it was a mistake of law. By and large, that is no longer true and it is of no critical importance whether a mutual mistake is one of fact or law." (footnote omitted)). Cf. Tidwell v. Tidwell,505 So.2d 1236, 1238 (Ala.Civ.App. 1987) (stating that "[a] contract may be rescinded if procured because of fraud or mutual mistake of law"). But see West End Sav. Bank v. Goodwin,223 Ala. 185, 187, 135 So. 161, 162 (1931) (stating the general proposition that "a court will not reform a contract for a mere mistake of law," and explaining exceptions); and AtlasAssurance Co. v. Byrne, 235 Ala. 281, 282,178 So. 451, 452 (1938)(same).
[3] See § 8-1-2, Ala. Code 1975, which provides:
 "When, through fraud, a mutual mistake of the parties or a mistake of one party which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised by a court on the application of the party aggrieved so as to express that intention, so far as it can be done without prejudice to the rights acquired by third persons in good faith and for value."
See also Restatement (Second) of Contracts § 155(1981).
[4] See 27 Richard A. Lord, Williston onContracts § 70:125 at 612 (4th ed.2003):
 "To justify rescission, a mistake of law must have related to a question, the answer to which was assumed as part of the fundamental basis of the transaction."
See also Restatement (Second) of Contracts § 152(1) (1981), and Blackwell v. Adams,467 So.2d 680 (Ala. 1985) (holding that a judgment may be set aside under Rule 60(b)(6), Ala. R. Civ. P., based on a mutual mistake of the parties). *Page 393